**LOUISIANA POWER & LIGHT COM-
PANY et al., Petitioners,**

**v.**

**FEDERAL POWER COMMISSION,
Respondent.**[*]

Nos. 72-1714, 72-1715, 72-1720, 72-1721,
72-1724, 72-1784, 72-2185 and
72-2188.

United States Court of Appeals,
Fifth Circuit.

June 28, 1973.

Rehearing and Rehearing En Banc
Denied Sept. 5, 1973.

[*] Consolidated with: Shell Oil Company v. Federal Power Commission; New Orleans Public Service Inc. v. Federal Power Commission; Texas Gulf Sulphur Company v. Federal Power Commission; State of Louisiana v. Federal Power Commission; Gulf States Utilities Company v. Federal Power Commission; Louisiana Gas Service Company v. Federal Power Commission; Exxon Corporation v. Federal Power Commission.

John T. Miller, Jr., Washington, D. C., George W. Hugo, Houston, Tex., W. C. Nelson, New Orleans, La., Nelson Jones, Thomas G. Johnson, Dan A. Bruce, William G. Riddoch, Houston, Tex., E. Burt Harris, New Orleans, La., Martin N. Erck, John R. Rebman, J. Kirby Ellis, Houston, Tex., Daniel F. Collins, Sherman S. Poland, James Douglas Welch, Wm. Warfield Ross, Washington, D. C., Stanley Plettman, Beaumont, Tex., Andrew P. Carter, H. Sloan McCloskey, New Orleans, La., Arnold D. Berkeley, Washington, D. C., Kirk W. Weinert, John M. Young, Houston, Tex., J. Donald Annett, Washington, D. C., R. J. Leithead, Sam Riggs, Jr., Tulsa, Okl., for petitioners.

John J. Keating, Jr., J. Richard Tiano, Deputy Sol., Leo E. Forquer, Gen. Counsel, George W. McHenry, Jr., Acting Sol., Federal Power Commission, Washington, D. C., for respondent.

J. Evans Attwell, W. John Shirley, Jack D. Head, Houston, Tex., Peter H. Schiff, Gen. Counsel, Public Service Com'n, Albany, N. Y., Richard A. Solomon, Jerome Ackerman, James R. McCotter, Howard E. Wahrenbrock, Washington, D. C., John M. Kuykendall, Jr., Jackson, Miss., Leon M. Payne, William B. Cassin, Wm. C. Harvin, Wm. R. Choate, Perry O. Barber, Jr., Jeron L. Stevens, Houston, Tex., Sharon Pierson, Pierson & Semmes, Washington, D. C., Robert F. LeBlanc, Tulsa, Okl., and L. E. Frazier, Jr., Houston, Tex., for intervenors.

Before JOHN R. BROWN, Chief Judge, and BELL and MORGAN, Circuit Judges.

LEWIS R. MORGAN, Circuit Judge:

This case is another in the long-running and seemingly endless saga of "Who Gets The Gas?", starring the major oil companies, the natural gas pipelines, major industrial users of natural gas, and the Federal Power Commission. Also featured, albeit in somewhat of a bit part, is the individual gas consumer, "the little lady at the burner tip". Although possibly suited for short subject treatment, this proceeding has now become a full-length feature of epic proportions. Basically it is this court's task to consider petitions for review of FPC Opinions 610 and 610–A, in which the Commission took jurisdiction over a formerly intrastate pipeline in Eastern Louisiana. There are many parties with numerous underlying themes to present. From this confusion we must review whether or not the FPC correctly handed out the awards.

In Opinion 610, the FPC found that due to the injection of interstate gas, the formerly intrastate pipeline known

as the "Green System-East" was now subject to FPC jurisdiction. Despite all the many different methods used by the petitioners in stating the issues, there are basically only two points for us to consider in reviewing the Commission: (1) Was the FPC correct in holding that the Green System-East had become sufficiently interstate to confer exclusive federal jurisdiction? (2) Even if the system would be otherwise an interstate pipeline subject to jurisdiction, had Congress expressly withdrawn federal jurisdiction for a pipeline such as this by enactment of the Hinshaw Amendment to the Natural Gas Act?

Also, in Opinion 610, the FPC found federal jurisdiction over United's Purple System, another formerly intrastate pipeline. While the majority of the petitioners challenge only the existence of federal jurisdiction over the Green System, two petitioners, Cities Service and Gulf States Utilities, challenge the characterization of the Purple System as interstate. The nature of each of these pipelines will be considered separately below.

### The Green System-East

The Green System-East, a natural gas pipeline owned by United Gas Pipe Line Company, is physically situated entirely within the State of Louisiana in United's New Orleans division. For several years prior to October 1, 1970, when United filed an application for FPC certification for the Green System-East, these facilities had been operated as an intrastate system subject to the jurisdiction of the Louisiana Public Service Commission. At this point it is necessary to note that the Green System-East is connected through systems of valves with other pipelines, including United's Black System which is an interstate pipeline. It appears that all the gas which goes into the Green System-East is produced in Louisiana gas fields, although at some point some of this gas may be carried in pipelines which also carry gas dedicated to the interstate market. There exists a heated debate as to whether any gas once placed in the Green System-East can or does ever leave the State of Louisiana. These factual matters are basic to the holding of jurisdiction and will be considered in detail *infra*.

### Prior Proceedings

The Green System-East has been involved in a significant chain of court opinions. Petitioner, Louisiana Power & Light, previously brought suit in the United States District Court for the Western District of Louisiana seeking a determination of the intrastate character of the Green System-East. The district court, 332 F.Supp. 692 (1971), dismissed the suit, holding that the issue of the nature of the Green System-East was within the primary jurisdiction of the FPC.

On appeal, we reversed the district court, disagreeing that it was necessary to await Commission action. Louisiana Power & Light Co. v. United Gas Pipe Line Co., 5 Cir. 1972, 456 F.2d 326. This court went on to address the issue of the Green System-East's interstate character and held that any interstate gas which had been introduced into the system was so minimal in amount that federal jurisdiction had not attached.

In Federal Power Commission v. Louisiana Power & Light Co., 406 U.S. 621, 92 S.Ct. 1827, 32 L.Ed.2d 369 (1972), the Supreme Court reversed this court and agreed with the result reached by the district court. Noting that the FPC was conducting hearings of its own in this regard, the Court held that while the agency's decision would not be the last word, it must be the first. The FPC has now reached its decision, finding that the Green System-East is sufficiently interstate to be jurisdictional. It is that "first word" of the agency which we now must review and issue, if not the last word, at least the "next word".

### I.

Before proceeding to the merits of the controversy, it is helpful to have a firm picture of the various parties engaged in

this litigation and their respective interests in its outcome. It is also important to understand the practical effect of FPC jurisdiction on the parties.

The petitioners can be divided into basic groups. The major oil companies have an interest in the outcome both as sellers and purchasers of natural gas. Several smaller distribution companies which purchase gas from United and the Green System are also challenging the Commission decision. Of course, the petitioners include several state regulatory agencies charged with the duty of regulating pipelines which are intrastate in nature. Public utilities which purchase natural gas for resale are involved as parties, as are various towns, parishes and municipalities, both as gas purchasers and representing the public interest. Basically, the effect of federal jurisdiction over the Green System-East will have a similar effect on each of these parties, although not to the same degree.

The petitioners, quite naturally, paint themselves as the heroes of this piece, denominating United as the villain and the FPC as conspiratorial bedfellow or, at the least, stooge of United. In giving depth to this characterization of United, the petitioners seek to show United as a greedy, over-reaching and somewhat callous corporate giant out to gorge itself at everyone's expense. The accuracy of this picture, they say, is made crystal clear by the results which will flow from FPC jurisdiction in this case.

These horrors which petitioners feel will flow from FPC jurisdiction are basically twofold. First, the switch from Louisiana Public Service Commission regulation, which, with regard to direct sales is virtually non-regulation, to FPC regulation will permit United to abrogate numerous long-term contracts which it has entered in the past for deliveries of gas to gas purchasers. The importance of this benefit can be seen immediately. Many of these contracts have several years yet to run. They were negotiated in the days when the supplies of natural gas appeared to be endless and, thus, contracts for extreme-ly long terms, such as 20 years, were considered good business, sewing up a customer for the future. Of course, as we all know, with the rise of environmentalism which stressed the importance of natural gas as an essentially "clean" fuel and the realization that natural gas reserves and availability have been drastically overestimated, this country has been plunged into an "energy crisis". This "crisis" seems especially acute in the natural gas industry, possibly because of the greater demands for the fuel. Thus, what gas is available can be sold and indeed will be sold for substantially higher prices on today's market than a pipeline could realize under the old long-term contracts entered years ago. Even regulated prices would be substantially higher than the old contract rates, and it must be remembered that the FPC does not regulate the price of sales to direct customers such as large industries but only sales where ultimately the gas will be resold.

Secondly, the gas shortage has led to the necessary allocation of priorities and rationing of this limited supply of natural gas. Through what is popularly called "curtailment", pipelines are allowed to file, subject to Commission approval, plans of allocation of the available gas, basically to ensure that gas goes not to the highest bidder but to those who need it most in the public interest. FPC jurisdiction, thus, also brings in the almost certain result of curtailment of deliveries, even contractually agreed to deliveries. See International Paper Co. v. Federal Power Commission, 5 Cir. 1973, 476 F.2d 121.

The parties who sell gas to United for the Green System-East are also worried that if the Green System-East is held interstate they will be in a difficult contractual situation because the gas they are using to fill United's needs is restricted in many cases to the intrastate market only by contracts with those having the gas rights. Thus, they fear that they will have to use other gas to service the Green System-East.

Viewing this situation, the petitioners present United as out after the "fast buck". They allege that United was perfectly willing to be regulated, or in some cases not regulated, by the Louisiana Public Service Commission until it became evident to United that it was to its distinct financial advantage to come under FPC jurisdiction. They further suggest that to obtain Commission jurisdiction, United improperly and perhaps illegally injected interstate gas into the Green System-East, as it could do because of the interconnecting valves, solely for the purpose of creating an argument for jurisdiction to present to the Commission.

United, for its part, seeks to reverse these roles and cast itself as the "good guy". United presents a picture of greedy private industries wishing to gobble up all available gas for their own selfish use, to the detriment of other consumers and the public in general. United claims that any diversion of interstate gas into the Green System-East was because it was absolutely necessary to meet contract deliveries. United supports the Commission finding as in the best interest of the consuming public. Agreeing with United on this point, at least as far as its consumers go, is the Public Service Commission for the State of New York. New York intervened, alleging its fear that United would divert substantial amounts of gas dedicated to the interstate market, including New York consumers, to fill these Green System-East contracts unless the federal authorities exercised control.

Thus, the battle line is drawn and, as usual, the dispute is not over gas alone, but also money. In reviewing the Commission's opinion, we must put away these self-serving charges and countercharges and look to the legal issues of the requisites for federal jurisdiction. In light of the Supreme Court's directive in *Louisiana Power & Light Co.*, supra, our task must begin with the FPC's decision.

### II.

*Opinions 610 and 610–A*

The first question which the FPC faced in entertaining United's request was whether or not the Green System-East was indeed a jurisdictional pipeline. Noting that none of the interconnections at which United alleged interstate gas to have flowed into the Green System had been certificated by the Commission, the FPC stated that "the facts which must be used for determining jurisdiction are based on unauthorized flows of interstate gas into and out of the . . . facilities". In its presentation, United had marked a map of its system showing the points at which interstate gas had been injected into the Green System. The amounts of gas injected at each of these points, as found by the Commission, are set out in the margin.[1] Having found that gas

---

1. (b) *Flow of Interstate Gas in New Orleans Facilities*
20. At point "I" United receives gas from producers in the Bastian Bay area whose sales have been certificated for interstate commerce. The gas enters one of United's major certificated interstate gas pipelines extending toward Lirette, Louisiana, and also enters one of United's 20-inch supply lines which transports gas to New Orleans. On an annual basis the 20-inch line received 3,286,407 Mcf from the Bastian Bay area and on the peak days of March 3, 1971, and January 6, 1970, received 72,990 Mcf and 56,182 Mcf, respectively.

21. At point "J" United receives gas from producers in the Bay Marchand, Calliou Island, and Bayou Jean la Croix fields. On an annual basis United received 20,414,367 Mcf from those fields of which 2,119,631 Mcf were transported in United's pipeline extending to the New Orleans area while the remainder of the gas was transported to market in United's certificated Lirette-Mobile interstate pipeline. On the peak day of January 6, 1970, 66,432 Mcf were received of which 16,437 Mcf entered the New Orleans pipeline and the remainder flowed into the Lirette-Mobile line. On the peak day of March 3, 1971, 47,116 Mcf were received

which ultimately found its way into the Green System had at one time been transported in a pipeline which carried interstate gas even though all the gas was produced within Louisiana and had never physically been outside the state,[2] the Commission went ahead to decide whether or not the amount gave it jurisdiction.

The Commission found that the amounts involved were substantial and were sufficient to give the Commission jurisdiction. On peak days for 1970 and 1971 which were chosen, the Commission figures showed that 153,376 Mcf and 189,846 Mcf, respectively, flowed into the Green System-East. The Commission rejected a *de minimis* argument made by several of the petitioners stating that the interstate portion of the gas on peak days represented 7.79 percent of the requirements and on an annual basis, 2.39 percent of the requirement.[3] Several of the parties dispute these findings made by the Commission, especially the holding as to the total amount introduced into the Green System-East. We will discuss these

points in more detail later in the opinion.

Viewing the total picture presented by all the various factors in the record before it, the FPC found that the Green System was an integrated part of United's interstate (or Black) system and that the Green System-East could no longer be left to state regulation as a purely intrastate pipeline. We note that the Commission somewhat retreated from its suggestion that Green System gas flowed out of the State of Louisiana in a physical form. In Opinion 610–A, the FPC stresses that its finding that Green System gas is introduced into Mid-Louisiana's pipeline is simply to show that it is commingled with gas which has moved in interstate commerce. This factor, according to the FPC, gives support to its holding that the Green System has become integrated with interstate systems even though the gas itself never flows out of the state.

The FPC went on to hold that jurisdiction was not to be determined by the amounts of gas involved. They held that jurisdiction attached wherever even

and all of the gas on that day entered the Lirette-Mobile pipeline.

22. At point "K" United receives gas from producers in the Houma and other fields. The stream is split with some gas entering a 12-inch line extending toward New Orleans while the bulk of the gas travels in United's certificated Lirette-Mobile interstate pipeline. On an annual basis 13,481 Mcf entered the New Orleans pipeline and on the peak days of March 3, 1971, and January 6, 1970, no gas entered the New Orleans facilities.

23. At point "L" United's certificated Kosciusko interstate pipeline delivers large volumes of gas into local facilities for transportation to Gulf States Utilities Company's Willow Glen electric generating station which is located south of Baton Rouge. On an annual basis 38,177,591 Mcf were delivered at that point and on the peak days of March 3, 1971, and January 6, 1970, United delivered 64,017 Mcf and 15,744 Mcf, respectively, for consumption in the power plant.

24. Point "M" is located very close to point "L", but the gas flows from the certificated interstate line into an uncer-

tificated pipeline extending toward the Baton Rouge area. On an annual basis 2,055,759 Mcf were delivered and on the peak days of March 3, 1971, and January 6, 1970, 52,762 Mcf and 64,868 Mcf, respectively, were delivered.

25. At point "X" United receives gas produced in the De Large field area. After receipt, the gas stream is split with gas entering both the interstate and local markets. On an annual basis 2,773,124 Mcf were received of which 157,426 Mcf were consumed in the Dulac area. On the peak days of March 3, 1971, and January 6, 1970, 5,490 Mcf and 9,061 Mcf were received with 77 Mcf and 145 Mcf, respectively, being consumed in local markets while the remainder entered interstate pipelines.

2. This is in dispute, but it is clear that some gas once carried in the Green System-East ends up in an *interstate* pipeline owned by Mid-Louisiana, but in all probability this gas does not physically leave Louisiana.

3. Adjustments raise these figures to 10.7% and about 3.4%, respectively.

an infinitesimal amount of interstate gas was injected into the system. For these purposes, the Commission defines interstate gas as any gas which had ever been carried in a certificated interstate pipeline.

Section 1(c) of the Natural Gas Act, commonly known as the Hinshaw Amendment, provides an exemption from federal regulation wherever all the gas received by the system is to be consumed wholly within the state. The Commission refused to apply the Hinshaw exception, apparently finding that the Green System-East was an integrated facility and part of United's total system.

Relying on California v. Lo-Vaca Gathering Co., 379 U.S. 366, 85 S.Ct. 486, 13 L.Ed.2d 357 (1965), and this court's Florida Parishes, opinion, Louisiana Public Service Commission v. FPC, 5 Cir. 1966, 359 F.2d 525, the FPC held that there had been sufficient commingling of intrastate and interstate gas to require that the Commission take jurisdiction over the Green System-East. The Commission also expressly rejected the argument that United had illegally and improperly introduced interstate gas into the Green System-East. First, it found the amounts injected were necessary to meet contract commitments, but, more importantly, stated the existence of jurisdictional facts controlled no matter what the motive.

Commissioner Carver dissented from Opinion 610. His primary reason for dissenting was his feeling that this circuit's opinion in Louisiana Power & Light v. United Gas Pipe Line Co., 456 F.2d 326, which had not yet been passed on by the Supreme Court, was controlling and that the Commission was bound by res judicata. In his remarks, Commissioner Carver criticized the Commission for failure to take account of what he felt were the obvious reasons that United was now seeking Commission jurisdiction. He pointed out that the long-term industrial contracts were no longer beneficial to United because of the low rate structure and impending supply crisis. He also referred to the protected curtailment that United had previously sought from the Commission. See International Paper Company v. FPC, 5 Cir. 1973, 476 F.2d 121. He further stated:

> Administrative bodies should not be insensitive to guiding principles of equity, and here there is a glaring lack of clean hands.

Following the petitions for rehearing, the Commission issued Opinion 610–A. In this opinion, the Commission retreated somewhat from its conclusion that Green System-East gas flowed out of the State of Louisiana. The Commission also attempted to clear up several other statements in Opinion 610 which were questionable. Commissioner Carver again dissented. He points out that the retreat as to Green System-East gas flowing out of the State of Louisiana undermined the entire finding of jurisdiction. Furthermore, he objected to the majority's use of "official notice" in considering flow charts not made a part of the record in the case without giving the parties an opportunity to present analysis of those flow diagrams. Commissioner Carver concludes that the interstate gas which does flow into the Green System-East is so minimal and insignificant that the Commission should not take jurisdiction.

### III.

At the outset, we note that the FPC has apparently decided to treat the entire Green System, formerly known as Green System-East and Green System-West, as a single unit for purposes of determining the existence of federal jurisdiction. In the past the Green System-East has been that part of United's New Orleans division facilities lying east of United's Napoleonville-Kosciusko interstate pipeline system. There is no abrupt stopping point for Green System gas when it reaches the Napoleonville-Kosciusko line; it simply continues to flow on toward the Baton Rouge area, but with the pipe denominated the Green System-West. Apparently this

artificial division has been allowed to exist unchallenged for a number of years. In the past this one continuous pipeline has apparently been treated, for certification purposes, as two separate entities. The Green System-West has long been certificated while the Green System-East has been considered totally intrastate. As Commissioner Carver points out in his dissent to Opinion 610:

> However, [United] has maintained a separate pipeline facility to serve customers in Louisiana on a strictly intrastate basis. Certification of this entity, or the purchases or sales made in connection with it, has been scrupulously avoided. No question of its jurisdictional status has been raised by the Commission staff, notwithstanding frequent audit, inspection, and review of company operations. In every way, United's Green System-East has been held out to customers and regulators alike as a local service unit, free of Federal regulatory impact, and free to contract in any manner it chose, consistent with State law.

In Opinion 610, however, the FPC indicates that at this time the whole New Orleans facility, the entire Green System, must be considered as a unit.

The FPC, in finding jurisdiction, relies heavily on the fact that gas which must be denominated interstate gas flows into and out of the Green System. The flow charts used by the Commission for the year 1969 show that 5,419,519 Mcf of gas were supplied from interstate lines into the Green System-East, that part of the Green System east of the Napoleonville-Kosciusko line. Aside from a minuscule and irregular injection of less than 14,000 Mcf at Point "K", this entire volume of gas was injected at Points "I" and "J". The FPC found that this gas was interstate in nature because it was taken from a commingled stream of gas designated for the interstate market. Both Points "J" and "I" present similar factual situations since they both involve gas processing plants and the splitting of a commingled stream into two pipes, one leading to United's interstate system, the other into the Green System-East.

The Commission also held that substantial quantities of interstate gas were delivered into the Green System at Points "L" and "M", which are both located west of the Napoleonville-Kosciusko line in the Green System-West. At Point "L" over 38,000,000 Mcf is delivered into what is known as the Willow Glen Loop. This loop is also supplied with almost 7,000,000 Mcf directly from the Green System-West and it should be noted that this exit for Green System gas is located very close to the alleged breakpoint between the Green System-East and the Green System-West and that this injection of almost 7,000,000 Mcf is over three-fourths of the total volume which the so-called Green System-East delivers to the so-called Green System-West. At Point "M", the Napoleonville-Kosciusko line delivers approximately 2,000,000 Mcf into the so-called Green System-West. This 2,000,000 Mcf joins with the almost 2,000,000 left after delivery to the Willow Glen Loop and, with various further receipts and deliveries in the so-called Green System-West, continues on to the end of that pipeline for exchange into Mid-Louisiana's interstate piepline for transportation and sale within the Baton Rouge area. It should be noted that the Mid-Louisiana line contains interstate gas flowing in from Mississippi.

Based on these injections and comminglings of interstate gas into and within the Green System, the Commission found that it had jurisdiction over the entire system. In its opinion, the FPC noted that, even without consideration of Points "L" and "M", after adjustments, about 3.4% of the Green System-East's annual requirements were supplied from these interstate gas sources. For the peak day of January 6, 1970, the adjusted figures did show that 10.7% of the flow into the Green System-East facilities was injected from interstate gas. The Commission expressly found that these quantities are not *de minimis*. The Commission expressly

found that without these injections of interstate gas there would have been a serious deficiency to serve the New Orleans area. Furthermore, the Commission found that this deficiency will seriously increase in the next few years, especially during the peak winter months, with the result that more and more interstate gas would have to be diverted to satisfy commitments. Thus, the Commission has explicitly held that the interstate injections are not minimal in amount nor are they of a temporary nature. Rather, the Commission feels that the amounts were significant, especially on peak days, and that continued delivery of interstate gas will be necessary to fill contractual obligations on the Green System-East.

Several, but not all, of the petitioners attack the Commission's use of a commingling theory based on People of the State of California v. Lo-Vaca Gathering Co., 379 U.S. 366, 85 S.Ct. 486, 13 L.Ed. 2d 357 (1965); FPC v. Amerada Petroleum Corporation, 379 U.S. 687, 85 S.Ct. 632, 13 L.Ed.2d 605 (1965); and, most especially, our decision in Louisiana Public Service Commission v. FPC, 5 Cir. 1966, 359 F.2d 525 (commonly called Florida Parishes). In seeking to distinguish these cases the petitioners rely on this court's opinion in Louisiana Power & Light Company v. United Gas Pipe Line Co., 5 Cir. 1972, 456 F.2d 326, in which we held that "the flow of gas from the Black System into the Green System in the case at bar is occasional and irregular as well as minimal". Id. at 339. The petitioners stress that our conclusion in that case was based on substantially the same evidence presented to the Commission and that we must now reach the same result.

As previously noted, the Supreme Court vacated that part of our opinion referred to above which held that there was no FPC jurisdiction over the Green System-East. 406 U.S. at 647, 92 S.Ct. at 1841, 32 L.Ed.2d at 389. The Court held that the determination of jurisdiction was for the FPC in the first instance

with our role limited to the normal processes of judicial review under the Natural Gas Act.

The Federal Power Commission was set up by Congress to bring a degree of regulatory expertise to the problems of regulating the transportation and consumption of natural gas, as well as other forms of energy. Because of their familiarity with the area in which they operate, the Commissioners are able to make substantially more accurate judgments than courts would be. Here the Commissioners have found that the injections of gas of an interstate character are not minimal and irregular, but are indeed substantial, fairly constant, likely to continue in volume, and necessary to meet contractual commitments. Because of our prior holding, it is almost certain we would not reach the same conclusion as an initial matter. However, ours is not to substitute our judgment for that of the FPC on an issue where that body's intimate knowledge of the specific problems is concerned. We feel that determinations as to the amounts and constancy of the flow and their characterization in terms of impact and necessity therefor, once made by the Commission, cannot be lightly set aside by a court. In *Louisiana Power & Light* we were admonished by the Supreme Court to give the Commission the first chance to determine its jurisdiction in this case. The Commission has found that the Green System-East is a part of United's integrated interstate pipeline system and that the amounts involved are not minimal. In making this latter determination, the Commission expressly considered and rejected the position of this court in *Louisiana Power & Light* as it applied to the facts found. Disagreeing with our holding that the injections were minimal, the FPC pointed out that the peak day injections were sufficient to heat over 100,000 homes. Exercising our limited review as opposed to interpreting *de novo*, we find that we may not overturn the Commission's holding. We cannot

say that there is no reasonable basis for the FPC's position. See 4 Davis, Administrative Law Treatise § 30.05.

Among other things, the Commission found that any amount of interstate gas would give jurisdiction. The opinion seems to suggest that one molecule would be sufficient to automatically confer federal control. We do not reach or consider that issue in this opinion. It appears to this court that there would clearly be times when the amounts of natural gas involved would be so irregular and minimal that Commission jurisdiction would be absurd. However, as noted, the Commission has found that such is not the case as to the Green System-East and we find that to reverse the Commission on this point would simply be substituting our own judgment for that of the Commissioners, a luxury that we do not possess under our limited review.

■ Thus, we find we must sanction those parts of the FPC's Opinions 610 and 610–A which establish federal jurisdiction over the Green System as an interstate pipeline. We are somewhat troubled by the assertion of Commissioner Carver and several of the petitioners concerning United's motive in obtaining FPC jurisdiction. However, we do not feel that we have any available way to step in and sort out the competing inequities and reach what would be the fairest result for all concerned. That is the job for the Commission, and it is for the Commission to decide how to balance competing equities or how to

penalize "unclean" parties in appropriate cases.

We would point out that federal regulation is not to be considered a plaything to be turned on and off to suit a pipeline's financial advantage. We feel confident that the FPC would not allow itself to be so used and are certain that courts would not allow such a practice to continue. Despite the innuendo and insinuation in this case, we see no direct evidence to support these suggestions of improper motive and conduct.

### IV.*

### *The Hinshaw Amendment*

Section 1(c) of the Act (the "Hinshaw Amendment") describes certain persons and facilities whose participation in the transportation and sale of gas in interstate commerce is "primarily of local concern and subject to regulation by the several States". 15 U.S.C. § 717(c). Under § 1(c) these persons and facilities are exempt from the jurisdiction of the Commission.[4]

In the proceedings before the Commission the petitioners maintained that even if the gas transmitted through the Green System-East were interstate in character, the Commission would not have jurisdiction over it because the Green System-East falls within the provisions of § 1(c). The Commission held that the Green System-East is not an exempt facility within the meaning of that section. The petitioners contend

---

* Judge Bell authored Part *IV, The Hinshaw Amendment,* for the court.

4. The text of the provision is the following:

(c) The provisions of this chapter shall not apply to any person engaged in or legally authorized to engage in the transportation in interstate commerce or the sale in interstate commerce for resale, of natural gas received by such person from another person within or at the boundary of a State if all the natural gas so received is ultimately consumed within such State, or to any facilities used by such person for such transportation or sale, provided that the rates and service of such person and facilities be subject to regulation by a State commission. The matters exempted from the provisions of this chapter by this subsection are declared to be matters primarily of local concern and subject to regulation by the several States. A certification from such State commission to the Federal Power Commission that such State commission has regulatory jurisdiction over rates and service of such person and facilities and is exercising such jurisdiction shall constitute conclusive evidence of such regulatory power or jurisdiction.

this holding was erroneous. We disagree.

Congress enacted the "Hinshaw Amendment" to preserve state control over local distributors who purchase gas from interstate pipelines.[5] Congress did not intend the amendment to relieve the Commission of jurisdiction over local branches of integrated interstate systems.

We discern this intent in the legislative history. During the debate in both houses, supporters of the measure were at pains to emphasize that the proposed exemption was not for the benefit of interstate pipeline companies. See, e. g., 99 Cong.Rec. 10569–70 (remarks of Congressmen Hinshaw, Harris, and Yates). Critics of the measure suggested that the exemption would provide interstate pipelines with a means of defeating federal jurisdiction over portions of their operations which deliver gas for consumption wholly within a single state. One senator suggested that if an interstate pipeline placed one of its statewide delivery systems under the control of a wholly owned subsidiary and delivered gas to the subsidiary at the state line, the local system would qualify for exemption under the terms of the bill. See 100 Cong.Rec. 3173 (remarks of Senator Burke). Senator Bricker, one of the sponsors of the bill in the Senate, vehemently denied this:

"[T]here is no intent to place any pipeline company outside the jurisdiction of either the Interstate Commerce Commission or the Federal Power Commission.

"As soon as such a pipeline company were formed, it would come within the jurisdiction of the Federal Power Commission.

"This measure is not an effort—and I make this statement for the RECORD—to remove such companies from the jurisdiction of the Federal Power Commission. If such an interpretation is made, it is without basis or support or foundation upon anything stated at any of the committee hearings." *Id.*

The congressional intent not to exempt local segments of integrated interstate pipeline systems from regulation by the Commission finds clear expression in the language of the statute. Thus, under § 1(c) it is not sufficient that all the gas transmitted through a given facility be consumed within a given state, or that a facility be subject to state regulation which is at least as extensive as that which the Commission would administer. Rather, the facility must be controlled ("used") by a "person" who receives gas from "another person" at or within the state lines. It follows that a facility cannot be exempt if the "person" who receives the gas is the same "person" who transmits the gas into the facility in the first instance. In effect, the requirement of a "person-to-person" exchange at the point of receipt ensures that the statutory exemption will not extend to local branches of a single interstate system, all of which is operated by the same "person".

In the present case we are not called upon to define with precision the degree of independence that must exist between the person who gives and the person who receives gas at or within state lines in cases where the exemption is warranted. Nor need we consider the propriety of the Commission's prior determinations with regard to the availability or non-availability of the exemption in other cases. Under any plausible reading of the "other person" requirement, the Commission's determination in this case must be sustained.

---

5. The amendment was necessary because of an early decision of the Supreme Court which, in construing the scope of the Commission's jurisdiction over the transportation and sale of gas "in interstate commerce", held that interstate gas does not lose its interstate character in the hands of local distributors who buy gas for resale and ultimate consumption within the state. FPC v. East Ohio Gas Co., 338 U.S. 464, 70 S.Ct. 266, 94 L.Ed. 268 (1950).

By virtue of the flow of interstate gas from the Black System into the Green, the Green System-East has ceased to be an intrastate facility and has become, instead, a local branch of an integrated interstate pipeline. In all its relevant parts, this pipeline system is operated by one person: United. At the points of connection between the Black System and the Green, United is the only person who gives gas, and United is the only person who receives. At those points—the points at which the exemption must take effect, if at all—the "person-to-person" requirement simply is not met.

Petitioners contend, however, that the requisite exchange from one person to another need not occur at the points where the exemption must take effect. They say that the person-to-person requirement may be satisfied by exchanges occurring at other points in the network of distribution or supply. Specifically, they claim that in this case the requirement may be satisfied by various exchanges that occur between the Black System and certain independent procedures "upstream" of the points of connection between the Black System and the Green, or by various exchanges between the Green System and certain independent intrastate producers "downstream" of these points of connection.

The legislative history makes it clear, however, that in the contemplation of the supporters and the critics of § 1(c) the exchange between the two persons described in the statute took place at a point where an exemption was necessary to protect the receiver from federal jurisdiction that would otherwise exist under the *East Ohio* decision.[6] In other words, the point of the person-to-person exchange was a point where exemption was needed, and it was a point where the proposed exemption was to take effect. See the Senate and House debates, *supra*.

Given this congressional understanding, we think that if the person-to-person requirement is to be met in this case, it must be met at a point of exchange where the exemption must take effect if the Green System-East is to be exempt. The point of exchange must correspond in some measure at least to the points of exemption. Here, however, the points where exemption must take effect are the points of connection between the Black System and the Green—the points where contributions of interstate gas to the Green System would otherwise confer federal jurisdiction. At none of these points is gas exchanged from one person to another.

The logic of a technical requirement that identifies the point of exemption with the point of the requisite exchange is apparent on the facts of this case. The contributions by independent producers of intrastate gas downstream of the points of connection between the Black System and the Green, or the contributions of interstate gas upstream of these points, do nothing to change the fact that the Green System is now a local branch of an integrated interstate system. Given Congress' overriding intent not to bifurcate the regulation of such system, these contributions should not enhance the Green System's eligibility for exemption under § 1(c). Under our interpretation of the person-to-person requirement, they do not.[7]

### The Purple System

The "Purple System" is a pipeline system in United's Lafayette district in southwestern Louisiana. This pipeline system, like the Green System-East, has long been considered an intrastate pipeline not subject to Commission jurisdiction. Two parties, Cities Service Oil Company and Gulf States Utilities Company, challenge the FPC's holding of

6. See Footnote 5.

7. Because we decide the Hinshaw issue on this ground, we need not consider the other grounds asserted by the Commission as a basis for its refusal to recognize the allegedly exempt status of the Green System-East.

federal jurisdiction over the Purple System.

 The FPC, without dissent as to these facilities, made specific findings showing that the Purple System is unquestionably an integrated part of United's interstate system. At Point "A", United obtained gas for the Lafayette facilities by exchange with an interstate transmission line of Texas Eastern Transmission Corporation. At Point "B" on the system map, United obtained over 1,000,000 Mcf on an annual basis from an interstate line of Texas Gas Transmission Corporation. At Point "C" on the flow chart, United delivered, on an annual basis, over 24,000,000 Mcf to Penzoil Pipeline Company for transportation across the Louisiana line into Texas. At Point "D", United received over 1,000,000 Mcf from Tennessee Gas Pipeline Company's interstate pipeline. At Point "H", over 16,000,000 Mcf were supplied into two streams, with a little over one-half being delivered into one of United's interstate pipelines for transportation out of the state, and the remainder used in the intrastate system. Finally, at Point "O", Tennessee delivered over 22,000,000 Mcf on an annual basis to United's Purple facilities which were commingled with locally produced gas and used in the Lake Charles area.

These facts amply establish that the Purple System is an integrated pipeline facility with many connections and exchanges of gas with interstate facilities. Gas clearly flows out of this system for interstate markets at Point "C". Significant volumes of gas from interstate facilities are introduced into the Purple System for local sale.

Cities Service attempts to distinguish the *Amerada*, *Lo-Vaca* and *Florida Parishes* cases by stating that all the facilities used for transportation for delivery to Cities Service at its refinery are located in Louisiana and all of the gas used at the Cities Service plant originates at production points or exchange points within Louisiana. Cities Service alleges that this makes the pipeline system purely intrastate.

On the contrary, we feel the evidence clearly establishes that this Purple System is part of an integrated pipeline network involving significant transportation of interstate volumes. We feel that the *Amerada*, *Lo-Vaca* and *Florida Parishes* cases cannot be distinguished successfully. We will not "lop off" certain parts of the otherwise integrated system to create an artificial intrastate pipeline.

For the reasons set forth above, the result reached by the FPC in Opinions 610 and 610–A with regard to jurisdiction over the Green System and Purple System is

Affirmed.