STATE OF LOUISIANA et al., Petitioners,

v.

FEDERAL POWER COMMISSION, Respondent,

United Gas Pipe Line Company et al., Intervenors,

INTERNATIONAL PAPER COMPANY et al., Petitioners,

v.

FEDERAL POWER COMMISSION, Respondent,

Gulf States Utilities Company et al., Intervenors.

Nos. 73–1994, 73–2146.

United States Court of Appeals, District of Columbia Circuit.

Argued Dec. 16, 1974.

Decided April 5, 1976.

Arnold D. Berkeley, Washington, D. C., with whom David R. Straus, Washington, D. C., was on the brief, for petitioners in No. 73–1994 and intervenor in 73–2146.

James R. McCotter, Washington, D. C., with whom Jerome Ackerman, Washington, D. C., was on the brief for petitioners in No. 73–2146.

William J. Grealis, Atty., F. P. C., Washington, D. C., with whom Leo E. Forquer, Gen. Counsel and George W. McHenry, Jr., Sol., F. P. C., Washington, D. C., were on the brief for respondent.

Jeron Stevens, Houston, Tex., with whom Perry Barber and William B. Cassin, Houston, Tex., were on the brief for intervenor United Gas Pipe Line Co.

John T. Miller, Jr., Washington, D. C., was on the brief for intervenors Monsanto Co. and Texasgulf Inc.

Thomas G. Johnson, William G. Riddoch and William A. Wood, Houston, Tex., were on the brief for intervenor, Shell Oil Co.

William Warfield Ross, Washington, D. C., and Richard A. Brown, Washington, D. C., were on the brief for intervenors, State of Louisiana, Louisiana Municipal Assn. and Louisiana Public Service Commission.

John P. Furman, Silver Spring, Md., was on the brief for intervenor Boise Southern Co.

Before BAZELON, Chief Judge, and MacKINNON and ROBB, Circuit Judges.

Opinion for the Court filed by Circuit Judge ROBB.

ROBB, Circuit Judge:

The petitioners challenge orders of the Federal Power Commission granting a certificate of public convenience and necessity to United Gas Pipeline Company (United) for facilities and services in its New Orleans Division. Pursuant to section 7(c) of the Natural Gas Act the certificate was issued by Opinion No. 661 (50 FPC 181) and Opinion No. 661–A, (50 FPC 779) denying rehearing.

United owns and operates a network of gas pipelines extending from Texas through Florida and, within that area, United buys gas and resells it to city gates (retail distributors), other pipelines and directly to industrial consumers. In past years parts of United's system, located in the New Orleans Division, were operated as uncertificated non-jurisdictional intrastate facilities. Beginning about 1965 the independent gas reserves which United had relied on to operate the New Orleans Division declined and became inadequate to serve the intrastate markets of that division. Accordingly United began transferring gas from its interstate facilities to the intrastate facilities in the New Orleans Division. The first transfer occurred on July 25, 1965.

The New Orleans Division is in southern Louisiana. In 1962 United filed a Petition

for Declaratory Order under section 16 of the Natural Gas Act, requesting the Commission to determine whether it had jurisdiction over sales to certain communities in another area of Louisiana, known as the Florida Parishes area. It appeared that gas produced in Louisiana, sold for resale and consumed within the state, was commingled in a stream containing gas which was transported to and consumed in other states. On these facts the Commission held that the sales of the intrastate gas, along with the transportation facilities and services rendered, were subject to the Commission's jurisdiction. *United Gas Pipeline Co.,* 30 FPC 560, decided August 26, 1963. The Commission's decision was appealed and affirmed in *Louisiana Public Service Commission v. FPC,* 359 F.2d 525 (5th Cir.), *cert. denied,* 385 U.S. 833, 87 S.Ct. 73, 17 L.Ed.2d 68 (1966).

After certiorari was denied in the *Florida Parishes* case United undertook to study the flow of its system to determine whether any of its other sales for resale, together with the services and facilities involved, were jurisdictional. From this study, United concluded that certain sales for resale in the New Orleans Division, along with the facilities involved, were jurisdictional. On October 1, 1970 United filed an application in Docket No. CP 71–89 for a certificate of public convenience and necessity authorizing the continued operation of the New Orleans Division as a part of its integrated interstate pipeline system. In its application United represented that its transmission facilities in the New Orleans Division and the services performed through those facilities were interstate in character, and therefore subject to the Commission's regulation, because part of the gas delivered to the customers of the New Orleans Division was transported "through pipelines which carry gas in a commingled stream, which stream thereafter crosses a state line, and part of the gas delivered to these particular sales (sales to the New Orleans Division) is purchased from producers issued certificates of public convenience and necessity by this Commission authorizing sale of the gas in interstate commerce."

During the hearings on United's application the evidence disclosed that the gas reserves which previously had been used to supply the New Orleans Division were declining rapidly and would be insufficient to meet the future New Orleans Division requirements. A witness for United testified that the deficiency would have to be made up by deliveries from United's certificated gas reserves emanating from its interstate system and that this deficiency would become greater in the future.

Having waived the intermediate decision the Commission on February 9, 1972 issued Opinion No. 610, 47 FPC 245 (1972). In its opinion the Commission found that there was sufficient commingling of uncertificated and interstate gas to bring the sales and services of the New Orleans Division within the Commission's jurisdiction. The Commission found however that because of certain deficiencies in the record it was unable to determine whether the certificate sought by United should be granted. Accordingly the Commission remanded the proceedings to the Administrative Law Judge for further hearings. To prevent undue hardship that would have resulted from immediate termination of interstate deliveries the Commission authorized the continuation of existing deliveries of interstate gas into the New Orleans Division, pending the further hearings. These deliveries were also made subject to the curtailment provisions of United's tariff (47 FPC 264–268). The Commission noted that the evidence showed that approximately 67% of the peak day requirements for the 1971–72 heating season in the New Orleans Division would have to be satisfied through interstate gas supplies.

On April 7, 1972 the Commission issued Opinion No. 610–A denying applications for rehearing. Opinions Nos. 610 and 610–A were affirmed in *Louisiana Power & Light Co. v. FPC,* 483 F.2d 623 (5th Cir. 1973), *cert. denied,* 416 U.S. 974, 94 S.Ct. 2001, 40 L.Ed.2d 563 (1974).

After hearings in the remanded proceedings the Administrative Law Judge issued his initial decision, September 5, 1972. The

decision granted the certificate subject to certain conditions: (1) peak day volumetric limitations were imposed on the city gates customers and peak day and volumetric limitations on the direct sale customers; (2) compensatory minimum price conditions were imposed on direct sale contracts; (3) direct sales for boiler fuel use were required to be terminated within three years, with certain exceptions.

On the record developed before the Administrative Law Judge the Commission, on July 20, 1973, issued Opinion No. 661 granting the requested certificate. The Commission deleted the volumetric limitations, compensatory price conditions, and restrictions on sales for boiler fuel use, which had been imposed by the Administrative Law Judge.

On September 14, 1973 the Commission issued Opinion No. 661-A, denying rehearing. In this opinion the Commission dealt with one matter not discussed in Opinion No. 661. This matter was the contention of International Paper Company, Scott Paper Company, and Stauffer Chemical Company that the Commission should condition the certificate by requiring industrial and power plant customers in the New Orleans Division to compensate previously certificated customers for their costs of substitute fuel. The Commission rejected this contention. Thereafter the State of Louisiana, *et al.* (hereinafter referred to as Louisiana), Exxon Corporation and International Paper Company, Scott Paper Company and Stauffer Chemical Company (hereinafter collectively referred to as International Paper) filed their petitions for review of Commission Opinions Nos. 661 and 661-A. The petitions for review were consolidated by orders of this court. On motion of Exxon Corporation its appeal was dismissed May 23, 1974.

We turn to the specific arguments made by the petitioners.

■ International Paper argues strenuously that the principle of *Granite City Steel Co. v. FPC*, 115 U.S.App.D.C. 392, 320 F.2d 711 (1963) establishes that the grant of United's application was unlawful. In our opinion however the *Granite City* case is not controlling here. In that case several utility customers of a pipeline applied for more gas under section 7(a) of the Natural Gas Act, 15 U.S.C. § 717f(a), and one customer demanded more gas under section 5(a) of the Act. 15 U.S.C. § 717d(a). The Federal Power Commission assigned to the utility applicants a quantity of gas which the pipeline had been delivering to its direct industrial customers. This court set aside the reallocation of capacity between the industrial customers and the utility customers. Referring to section 7(a) of the Natural Gas Act which forbids the Commission to compel a natural gas company to "sell natural gas when to do so would impair its ability to render adequate service to its customers", the court said "[t]he theory and purpose of the statutory restriction appear to be that persons desiring gas for the first time, or desiring more gas, should not get it by taking it away from existing lawful customers." 115 U.S.App.D.C. 394, 320 F.2d 713 (1963).

We think the *Granite City* decision did not require the Commission to reject the *United* application. Although United was for the first time requesting authority to supply interstate gas to its New Orleans Division customers, those customers were not "persons desiring gas for the first time, or desiring more gas"; on the contrary they had been receiving intrastate and interstate gas for years—although the interstate gas was unauthorized. The Commission's order did not primarily take gas away from others and give it to those customers, but in recognition of the public interest and necessity merely continued a situation that had long existed. Moreover United's application was made and the Commission acted pursuant to section 7(c) of the Natural Gas Act, which does not contain language similar to the provision of section 7(a), that a pipeline shall not be required to extend service "when to do so would impair its ability to render adequate service to its customers."

■ International Paper complains that the Commission erred when it eliminated

the peak day and annual volume conditions recommended by the Administrative Law Judge. The Commission deleted these conditions on the ground that in view of the extensive curtailment on United's system, imposed by Commission Opinions Nos. 647 and 647–A, the proposed volumetric conditions would have no effect on the volume to be delivered to United's New Orleans Division customers.

Although International Paper continues to assert the need for volumetric conditions for city gate customers it appears to concede the "uncertainty, under present circumstances, as to the meaningfulness of certificate limitations on industrial sales. . . ." (Pet. Br. p. 30). Notwithstanding this conclusion it argues:

> the mere fact that curtailments . . . would perhaps make volumetric limitations superfluous for the immediate future is no reason not to include them in the certificates, especially because they would tend to protect previously certificated service at such time as curtailments cease. (Pet. Br., pp. 30–31)

The reason assigned by the Commission for the deletion of volumetric conditions was that such limitations had already been imposed upon all customers of United pursuant to Opinions Nos. 647 and 647–A. Those opinions established United's curtailment program; and thus the Commission reasonably concluded that the addition of volumetric limitations to the certificate here "would be meaningless until curtailment ceases."

As for International Paper's argument that volumetric conditions should be imposed now "to protect previously certificated service at such time as curtailments cease" it is difficult to understand why petitioners would need "protective conditions" once adequate supplies are again available.

In Order No. 431, 45 FPC 570 (1971) the Commission stated that those pipelines, such as United, finding it necessary to institute curtailment programs "should place, or already have in effect, volumetric limitations on sales at current levels"; and in Opinion No. 610 the Commission said "[a]ny certificate issued should contain volumetric limitations in accordance with the Commission's statement of policy in Order No. 431". 47 FPC at 264. From these statements International Paper argues that the certificate should impose "at the very least, peak day and annual volumetric limitations for city gate sales based on historical purchases during the year preceding commencement of curtailment by United (i. e., at the 'current levels' referred to in Order No. 431)". In its Opinion No. 661, deleting the volumetric certificate conditions imposed by the Administrative Law Judge, the Commission recognized that "[A]s a policy matter, in times of gas shortage, such certificate limitations are appropriate to protect the integrity of systemwide service and assure the most efficient and best allocation of limited gas supplies;" but, said the Commission:

> . . . we also recognize that United's previously jurisdictional customers, i. e. other than the New Orleans and Victoria customers, operated under certificates without volumetric limitations. Certain parties have contended that to impose volumetric conditions on one part of a pipeline system would violate the undue preference and discrimination provisions of Section 4(b) of the Act. We do not decide that issue today. We do, however, believe that it is equitable to all concerned and would better fulfill our responsibilities if we were to decide such issues for the entire pipeline system. Accordingly, we delete the peak day and annual voumetric conditions imposed by the Administrative Law Judge, without prejudice to the imposition of such conditions on all United's customers at some later date.

Thus, the Commission deferred action on volumetric conditions until this matter could be considered in proceedings designed to resolve the issues for United's entire pipeline system. We cannot say the position taken by the Commission was unreasonable.

■ International Paper argues that the Commission should have required that New

Orleans Division industrial customers be curtailed an additional 25% of their requirements. The argument runs that this 25% additional curtailment bears a rational relationship to the amounts by which the petitioners' volumes are being reduced as a result of United's continued deliveries to the New Orleans Division. Our attention is not directed to any evidence which demonstrates this relationship. In any event we think the additional curtailment sought by the petitioners would give them an "undue preference or advantage" and subject the New Orleans Division consumers to "undue prejudice or disadvantage" prohibited by section 4(b) of the Natural Gas Act. Moreover, as the Commission indicated in its opinion, the additional curtailment condition was one of the matters being considered in Docket Nos. CP 73–117, et al., pending before the Commission. We see no reason to fault the judgment of the Commission.

■ International Paper does not object to the Commission's deletion of the compensatory price condition imposed by the Administrative Law Judge. The petitioners argue however that the Commission should have required the New Orleans Division customers to compensate them for the additional cost of alternate fuels purchased to reduce the impact of United's curtailment on their own operations. In short, the proposal is that one group of customers be required to pay cash indemnities to another. Assuming, without deciding, that the Commission has the authority to impose such a condition we perceive in the record no showing that it was required by the public convenience and necessity. The New Orleans Division customers were not responsible for United's gas shortage or for any losses resulting to International Paper, and we see no reason why they should be financially penalized because of the shortage. As the Commission pointed out, if any monetary liability existed it was a liability on the part of United.

In support of its argument that monetary compensation from the New Orleans Divi-

sion customers should be required International Paper cites *Columbia Gas Transmission Corp.*, 48 FPC 647 (1972), and *Texas Eastern Transmission Corp.*, 48 FPC 1170 (1972). We think these cases do not support the argument that public convenience and necessity require the proposed condition. In neither case did the Commission find that public convenience and necessity required compensation; on the contrary in both cases the Commission merely approved a settlement agreement between the parties. Moreover in the *Columbia Gas* case the pipeline agreed to compensate its customers for additional curtailment; there was no agreement by one customer to compensate another. In the *Texas Eastern* case the agreement provided only that in the event of emergency exemption from curtailment the customer's annual entitlement from the pipeline would decrease by an amount equal to twice the exemption granted.

■ Louisiana contends that the Commission was required to issue an unconditioned "grandfather" certificate covering United's former intrastate facilities in the New Orleans Division. Louisiana's argument is that if the commingling of gas in 1965 caused jurisdiction to attach, then any certificate covering such existing facilities, sales and services should be effective as of that time, without any further need to demonstrate public convenience and necessity. In support of this position Louisiana relies upon section 7(c) of the Natural Gas Act. 15 U.S.C. § 717f(c). We think that reliance is misplaced.

Section 7(c), amending the Natural Gas Act, provided that if a natural gas company was engaged in transportation or sale of natural gas subject to Commission jurisdiction *"on the effective date of this amendatory Act, . . . the Commission shall issue [a] certificate without requiring further proof that public convenience and necessity will be served by such operation, and without further proceedings, if application for such certificate is made to the Commission within ninety days after the effective*

*date of this amendatory Act.*" [Emphasis added] Although the effective date of the amendatory Act was February 7, 1942 Louisiana argues that section 7(c) does not restrict the granting of certificates on a grandfather basis to those natural gas companies operating on February 7, 1942. The Commission disagreed and we think it was plainly right. This reading of the statute is confirmed by H.R.Rep.No.1290 accompanying H.R. 5249, 77th Cong., 1st Sess., 3 (1941) wherein section 7(c) was analyzed:

> . . . a certificate may be obtained without further proof of public convenience and necessity . . . where the applicant natural gas company . . . was, on the effective date of the act, and thereafter bona fide engaged in the transportation and sale of natural gas subject to the jurisdiction of the Commission. . . . Such application *must be made within 90 days of the effective date of the act. Other certificates are to issue only after notice and hearing in accordance with the procedures and requirements of subsection (e).* [Emphasis supplied]

Louisiana argues further that the Commission has in the past recognized its authority to grant grandfather certificates without a showing of public convenience and necessity. Precedents for the granting of such certificates may be found, says Louisiana, in *Kansas-Nebraska Natural Gas Co., Inc.,* 44 FPC 218 (1970), and in various orders issued by the Commission following the decision of the Supreme Court in *Phillips Petroleum Co. v. Wisconsin,* 347 U.S. 672, 74 S.Ct. 794, 98 L.Ed. 1035 (1954). These alleged precedents however do not support Louisiana's position. In the *Kansas-Nebraska* case certain new facilities were proposed which would bring previous intrastate operations within the jurisdiction of the Commission. After a statutory hearing the Commission found that the construction and operation of the proposed facilities were required by the public convenience and necessity and that certificates should be issued. The case had nothing to do with the granting of a grandfather certificate without a hearing. Similarly, the orders issued following the decision in the *Phillips Petroleum* case simply provided rules and regulations applicable to companies which the *Phillips* decision had brought within the jurisdiction of the Commission. *See Magnolia Petroleum Co. v. FPC,* 236 F.2d 785 (5th Cir. 1956). These orders established no policy or precedent extending the grandfather provision of section 7(c) of the Act.

■ Finally, Louisiana argues that in the exercise of its discretion the Commission should have issued the certificate *nunc pro tunc* as of 1965, when jurisdiction over the New Orleans Division first attached. According to Louisiana, the Commission's refusal to issue such a certificate was arbitrary and capricious. We do not agree. From the unquestioned premise that the Commission has authority to regulate a natural gas company within its jurisdiction prior to certification Louisiana draws the conclusion that certification must issue as of the first day that jurisdiction attaches. We think the conclusion does not necessarily follow. Although the Commission may of course regulate a company within its jurisdiction prior to certification, the policy of the Commission has been to certificate the continued operation of those facilities, sales and services found to exist as of the conclusion of the certification proceedings. *See, e. g., International Paper Co.,* 42 FPC 248 at 258 (1969), *aff'd sub nom., International Paper Co. v. FPC,* 438 F.2d 1349 (2d Cir.), *cert. denied,* 404 U.S. 827, 92 S.Ct. 61, 30 L.Ed.2d 56 (1971); *Mississippi River Fuel Corp.,* 9 FPC 198 at 216 (1950); and *Transwestern Pipeline Co.,* 34 FPC 659 at 666–668 (1965). We cannot say it is arbitrary or unreasonable for the Commission to relate its certificates to existing facilities, sales and services, rather than to those which existed in the past.

■ The petitioners Monsanto Company and Texasgulf, Inc. urge that the Commission's orders should be affirmed only to the extent that they apply to service initiated

or enlarged prior to the time the pipeline company knew it was short of gas, and that the orders should be reversed and remanded as to new and enlarged service initiated after that time. The difficulty with this argument is that it was not advanced in any application for rehearing on Opinion No. 661 by any of the parties. Under section 19(a) of the Natural Gas Act, 15 U.S.C. § 717r(a) therefore the contention is not properly before this court.

■ In passing on the application for a certificate the Commission was obliged to consider the public interest in the light of harsh reality. For eight years the customers in the New Orleans Division had received and consumed interstate gas and they were dependent upon that gas. Thus the record reflects that almost two-thirds of their requirements were filled by interstate gas, and on a peak day approximately 80% of their consumption was interstate gas. Denial of the certificate, thus shutting off interstate gas, would have been disastrous for New Orleans consumers both city gate and industrial. In this situation we think the Commission's order was a reasonable solution in the public interest, and was supported by the evidence. Under the order United was able to deliver approximately 75% of its system base requirements on an annual basis and over 75% of its requirements on a peak day. In the absence of a certificate for the New Orleans Division United would have been able to provide for its other customers about 87% of approximate base requirements. In other words customers other than the New Orleans Division were curtailed 13% more than they would have been had the New Orleans Division been cut off; but we think the Commission reasonably concluded that this was the best resolution of an unfortunate situation that could be achieved. The Commission was bound to act in the public interest, not in the interest of any particular consumer or group of consumers.

The orders of the Commission are *Affirmed.*