997 F.2d 925
 302 U.S.App.D.C. 235
 TEXAS UTILITIES ELECTRIC COMPANY, Petitioner,
v.
FEDERAL COMMUNICATIONS COMMISSION and United States of
America, Respondents,
TCI Cablevision of Dallas, Inc.; Florida Power & Light
Company; MFS Communications Company, Inc.; United States
Telephone Association; National Cable Television
Association, Inc.; Community Antenna Television
Association, Inc.; Utilities Telecommunications Council;
Duke Power Company; Continental Cablevision, Inc.;
Monongahela Power Company, the Potomac Edison Company and
West Penn Power Company (APS Operating Companies); South
Carolina Electric & Gas Company; American Electric Power
Service Corporation; Carolina Power and Light Company;
Virginia Electric and Power Company, Intervenors.
 No. 92-1032.
 United States Court of Appeals,
 District of Columbia Circuit.
Argued May 14, 1993.
Decided June 25, 1993.
 
 Michael D. Paul argued the cause for petitioner. With him on the briefs was Michael W. Faber.
 John E. Ingle, Deputy Associate Gen. Counsel, F.C.C., argued the cause for respondents. With him on the briefs were Renee Licht, Acting Gen. Counsel, and Gregory M. Christopher, Counsel, F.C.C., Robert B. Nicholson and James W. Lowe, Attys., U.S. Dept. of Justice. Robert L. Pettit also entered an appearance for respondent F.C.C.
 Paul Glist, John D. Seiver and Robert G. Scott, Jr., filed the briefs for intervenors TCI Cablevision of Dallas, Inc., National Cable Television Ass'n, Inc., Community Antenna Television Ass'n, Inc., and Continental Cablevision, Inc. Michael S. Schooler, David L. Nicoll and Diane B. Burstein entered appearances for intervenor Nat. Cable Television Ass'n, Inc. Gardner F. Gillespie entered an appearance for intervenor Continental Cablevision, Inc.
 Mark J. Tauber and Nora E. Garrote entered appearances for intervenor Florida Power & Light Co.
 Andrew D. Lipman, Jean L. Kiddoo and Helen E. Disenhaus entered appearances for intervenor MFS Communications Co., Inc.
 [302 U.S.App.D.C. 237] Martin McCue and James R. Hobson entered appearances for intervenor U.S. Telephone Ass'n.
 Jeffrey L. Sheldon entered an appearance for intervenor Utilities Telecommunications Council.
 Michael W. Faber and Michael D. Paul entered appearances for intervenor Duke Power Co.
 Philip J. Bray, Hegerstown, MD, entered an appearance for intervenors Monongahela Power Co., the Potomac Edison Co., and West Penn Power Co. (APS Operating Companies).
 Shirley S. Fujimoto and Kris Anne Monteith entered appearances for intervenors American Electric Power Service Corp., Carolina Power and Light Co., and Virginia Elec. and Power Co. Shirley S. Fujimoto with whom Kris Anne Monteith entered an appearance for intervenor South Carolina Elec. & Gas Co.
 Before WALD, HENDERSON and RANDOLPH, Circuit Judges.
 Opinion for the Court filed by Circuit Judge WALD.
 WALD, Circuit Judge:
 
 
 1
 This case comes to us as part of a second round in an ongoing battle over the rates that utilities may charge to cable television companies for attachments of cables to their poles. The first round commenced over twenty years ago when the nascent cable television industry turned to the poles owned by telephone and electric utilities as the only feasible method for building a network to access customers. The cable companies complained that the utilities were using their obviously superior bargaining position at that time to impose exorbitant pole attachment rates which threatened the viability of cable television. Congress responded in 1978 by authorizing the Federal Communications Commission ("FCC" or "Commission"), in the Pole Attachment Act ("PAA"), 47 U.S.C. § 224, to regulate rates assessed by utilities for "any attachment by a cable television system" to their poles. The cable companies had thereafter only to pay "just and reasonable" rates for attachments, currently in the neighborhood of $5 per pole per year.
 
 
 2
 Today, two decades later, the battle wages over the cable industry's efforts to enter the growing market for nonvideo communications services, such as data transmission. Intervenor TCI Cablevision of Dallas, Inc. ("TCI") offers both conventional video entertainment programming and nonvideo communications over the cables it attaches to utility poles owned by petitioner Texas Utilities Electric Company ("TU"). TCI complained to the Commission that TU levies the regulated annual rate of approximately $5 per pole where the cable transmits traditional video programming, but adds a surcharge of between $50 and $100 per pole where the cable, at least in part, transmits nonvideo communications. In response, TU asserted that the FCC's statutory authority over pole attachment rates was limited to those attachments distributing video programming. The FCC disagreed, positing that "Section 224 is most reasonably read to provide that a cable operator may seek Commission-regulated rates for all pole attachments within its system, regardless of the type of service provided over the equipment attached to the poles." It then found the pole attachment rates imposed by TU to be unjust and unreasonable, and accordingly, ordered a refund. TU now petitions for review of these determinations.
 
 
 3
 The stark question raised by this petition is whether the FCC may prohibit a utility from charging a cable television system operator an unregulated pole attachment rate because some cable attachments within the system are used to transmit nonvideo communications. We are unable to find in the PAA or its legislative history a clearly expressed intent on the part of Congress to limit the FCC's jurisdiction to pole attachments that are used strictly for traditional video programming. Faced with this statutory ambiguity, we believe the Commission has arrived at a permissible construction, rational and consistent with the congressional purpose in enacting the PAA. And finally, we can discern no error in the Commission's conclusion that the pole attachment rate charged by TU in the present proceeding is [302 U.S.App.D.C. 238] unjust and unreasonable. Therefore, the petition for review is denied.
 
 I. BACKGROUND
 
 4
 TCI enjoys an exclusive franchise to provide cable television service to the residents of Dallas. Pursuant to an agreement with TU, TCI leases space on TU's electricity poles to attach cable distribution facilities, consisting of coaxial or fiber optic cable and associated equipment. As a technical matter, the cables are lashed to an aerial support strand, which in turn is affixed to a single point within the section of the pole designated as "communications space." The coaxial cables are deployed primarily to transmit conventional video programming to the company's subscribers, but are also used for certain data transmissions among local school districts, fire departments, police stations and libraries. Similarly, within a sheath of fiber optic cable, certain strands may be dedicated to traditional video communication, while other strands may provide nonvideo communications services. This network of coaxial and fiber optic cable runs throughout the franchise region, but extends as well to points outside the Dallas area.
 
 
 5
 Under the pole attachment agreement, TCI is charged the regulated annual rate of about $5 per pole for any cable attachment designed to provide "cable television service." However, where any strand within the fiber optic cable transmits nonvideo communications, a surcharge of between $6 and $109 is added, depending upon the number of strands involved in the nonvideo transmission. In 1989, TU sought payment of the surcharge for cable attachments on some 1,800 poles, but TCI refused, complaining to the FCC that the premium was unjust and unreasonable under the PAA and requesting a refund of amounts previously paid. TU moved to dismiss TCI's complaint on the ground that the Commission's jurisdiction to regulate pole attachment rates was confined strictly to cable attachments used to distribute traditional video programming.
 
 
 6
 The Commission observed first that the TCI cable network represents a mixed system of coaxial and fiber optic cable, each of which transmits both video and nonvideo communications. Thus, the fiber optic facilities import satellite video signals that are then distributed over the air by microwave to coaxial cable facilities which distribute the video programming to individual subscribers. The fiber optic cable is also required by the Dallas franchise to serve as a redundant, back-up video feed in the event the microwave fails. Moreover, "TCI also utilizes its fiber optic cables to provide nonvideo broadband communications services to nonresidential customers, including data transmission services pursuant to private contract [with] commercial customers in the Dallas metropolitan area."
 
 
 7
 Turning next to the jurisdictional dispute, the Commission decided that the PAA is most reasonably read, in light of the legislative history, to confer upon the agency authority to regulate any pole attachment by a cable television system operator within its system and within its franchise area. Pole attachments outside the franchise area, whether for video or nonvideo communications, were deemed to be excluded from the act's coverage. The Commission concluded that "TCI is indisputably a cable television system operator within its franchise area," and therefore "Section 224 empowers [the Commission] to regulate the pole attachments at issue in this proceeding." Finally, the Commission noted that TU had provided no cost justification for imposing a surcharge for fiber optic strands transmitting nonvideo communications. It therefore concluded that TU could only "charge TCI a single, regulated rate for pole attachments within TCI's franchise area," and that any premium based on the type of service being provided over the cable equipment attached to the pole was unjust and unreasonable. At a subsequent hearing to determine the amount of any refund owed TCI, the Commission determined that for 1,705 of the 1,788 poles at issue, TU had assessed the § 224 rate of $4.90 per pole as well as an additional $90 per pole surcharge. For the remaining 83 poles, TCI had imposed only the $90 rate, presumably because those poles were used only for distributing nonvideo communications. Reasoning that TU should only have charged $4.90 per pole for all 1,788 poles, the Commission [302 U.S.App.D.C. 239] ordered the utility to refund almost $160,000 in excess charges.
 
 
 8
 At the end of 1991, the United States Telephone Association ("USTA"), which was not a party to the dispute, petitioned the FCC for reconsideration of its decision, arguing inter alia that many questions regarding the scope of the order had been left unanswered. The Commission refused the request, finding that the USTA had not adequately explained its failure to intervene at the appropriate time earlier in the proceedings. However, in partial response to the USTA's concerns, the Commission explained that its previous decision "interpreted Section 224 as it applies to TCI within the specific factual context presented by the complaint." The "context" was one in which "TCI, the franchised cable operator in Dallas, provides both traditional (i.e., video) and nontraditional (i.e., data) services on a 'commingled' basis over a single network within its cable franchise area." In any future adjudications, involving different facts, the USTA and others were free to participate and "raise any jurisdictional arguments at that time."
 
 
 9
 We turn now to the merits of TU's petition for review.[1]
 
 II. ANALYSIS
 A. Pole Attachment Act
 
 10
 Section 224 provides that in the absence of state regulation, "the Commission shall regulate the rates, terms, and conditions for pole attachments to provide that such rates, terms, and conditions are just and reasonable, and shall adopt procedures necessary and appropriate to hear and resolve complaints concerning such rates, terms, and conditions." 47 U.S.C. § 224(b)(1). According to the statute, a "rate is just and reasonable if it assures a utility the recovery of not less than the additional costs of providing pole attachments, nor more than an amount determined by multiplying the percentage of the total usable space ... which is occupied by the pole attachment by the sum of the operating expenses and actual capital costs of the utility attributable to the entire pole...." Id. at § 224(d)(1).[2] The pole attachments subject to the FCC's regulatory authority are defined as "any attachment by a cable television system to a pole ... owned or controlled by a utility." Id. at § 224(a)(4).
 
 
 11
 The basic issue in this case boils down to what Congress meant by the phrase "cable television system." By now, the analytical framework for resolving this type of interpretive question is so familiar that it requires little elaboration. We ask first, using traditional tools of statutory construction, whether Congress expressed in the statute a clear intent on the precise issue presented, namely whether the FCC may regulate pole attachment rates where the cables attached are used in part to transmit nonvideo communications. See Chevron, U.S.A. Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837, 842-43, 104 S.Ct. 2778, 2781, 81 L.Ed.2d 694 (1984); Illinois Bell Telephone Co. v. FCC, 966 F.2d 1478, 1481 (D.C.Cir.1992); United Video, Inc. v. FCC, 890 F.2d 1173, 1184 (D.C.Cir.1989). However, where ambiguity obscures our view of the congressional intent, we are obliged to defer to any reasonable construction of the statute offered by the Commission. See Chevron, 467 U.S. at 843-44, 104 S.Ct. at 2781-82; TRT Telecommunications Corp. v. FCC, 876 F.2d 134, 146 (D.C.Cir.1989).
 
 
 12
 TU asserts that Congress, by conferring upon the FCC jurisdiction over pole attachments "by a cable television system," meant clearly to limit regulation to those cables attached to distribute traditional television services, i.e., video programming. To the extent that a company attaches cables transmitting nonvideo communications, it is said to no longer be operating a cable television system and therefore ineligible for the [302 U.S.App.D.C. 240] regulated rate. On the other hand, the Commission does not regard the statutory language as unambiguous. Rather, it interprets the PAA as not distinguishing between the types of service transmitted over the cable, but only requiring that the attachment be made by a cable operator as part of a franchised cable television system.
 
 
 13
 At the outset, we note that the plain language of the PAA puts us immediately into something of an interpretive quandary. Because one does not ordinarily think of a "system" as having the capacity to "attach" anything, it seems incorrect, or at least imprecise, for the statute to speak of an "attachment by a cable television system." At least two ways of resolving this predicament come to mind. The phrase might mean that § 224 rates apply only to attachments for a cable television system, or it might mean that the regulated rate applies to any attachment by a cable television system company. In other words, while it seems obvious that the attachments must bear some relation to a cable television system, it is not entirely clear whether the statute places greater emphasis on the type of service to be distributed over the attachment or the type of entity doing the attaching. TU presents several reasons why this facial ambiguity in no way detracts from what it considers to be a plain legislative intent to exclude from regulation attachments for nonvideo communications.
 
 
 14
 First, TU argues that the meaning of the statutory phrase "cable television system" should be drawn from the FCC's extant definition at the time the PAA was enacted. The agency's regulations defined a cable television system as a
 
 
 15
 non-broadcast facility consisting of a set of transmission paths and associated signal generation, reception, and control equipment, under common ownership and control, that distributes or is designed to distribute to subscribers the signals of one or more television broadcast stations....
 
 
 16
 47 C.F.R. § 76.5(a) (1977). From this, TU concludes that the FCC's regulatory authority is limited exclusively to pole attachments that serve to distribute television broadcast signals. However, as the Commission noted in 1977, the definition was intended merely to set forth "the essential technological characteristics shared by all cable television facilities," First Report & Order, 63 F.C.C.2d 956, 964 (1977), and not to restrict or exhaust the variety of services that could be offered over a "cable television system." Indeed, if the phrase was construed narrowly, as TU suggests, to encompass only the distribution of signals from "television broadcast stations," a system which provided services traditionally understood to be "cable television," such as community access programming or made-for-cable programming, would not be considered a "cable television system." That, the Commission observes, would be an unlikely result.
 
 
 17
 Moreover, the Commission explains, it has long recognized the potential of cable television systems to provide not only video programming, but also "broadband" cable services, including data transmission. Thus, the Commission explained in 1970 that "CATV [Community Antenna Television] service represents the initial practical application of broadband cable technology," and that "there is a substantial expectation that broadband cables, in addition to CATV services, will make economically and technically possible a wide variety of new and different services involving the distribution of data." Final Report & Order, 21 F.C.C.2d 307, 324-25 (1970). Some of the potential broadband services identified by the Commission in 1972 included "[f]acsimile reproduction of newspapers, magazines, documents, etc.; electronic mail delivery; merchandising; business concern links to branch offices, primary customers or suppliers; access to computers ...; information retrieval (library and other reference material, etc.) and computer to computer communications." Cable Television Report & Order, 36 F.C.C.2d 143, 144 n. 10 (1972). The Commission contends that while Congress' primary concern in enacting the PAA was no doubt to facilitate the provision of cable television service to the public, it was surely aware of the agency's longstanding view of the capacity of cable television systems. In fact, the Senate report accompanying the PAA noted that "the introduction of broadband cable services may pose a competitive threat to telephone companies, and that [302 U.S.App.D.C. 241] the pole attachment practices of telephone companies could, if unchecked, present realistic dangers of competitive restraint in the future." S.REP. NO. 580, 95th Cong., 2d Sess. at 13, reprinted in 1978 U.S.C.C.A.N. 109, 121. We therefore cannot agree with TU that Congress, if it meant to incorporate the FCC's definition of "cable television system," specifically intended to restrict rate regulation to attachments distributing television programming; even under the FCC regulation a system that distributes both video and nonvideo communication does not necessarily disqualify itself from being a cable television system.
 
 
 18
 Second, TU observes that an earlier version of the PAA would have regulated "any attachment for wire communication " rather than the eventual "any attachment by a cable television system." H.R.REP. NO. 1630, 94th Cong., 2d Sess. 2 (1976) (emphasis added). It argues that substitution of the narrower phrase "cable television system" evidenced Congress' plain intent to restrict rate protection to attachments for traditional television services, rather than for the full range of wire communications. We disagree that the legislative purpose is so clear. The switch was made at the behest of the Commission, which wrote to Congress explaining that
 
 
 19
 under the proposed bill, the Commission might be involved in assuring just and reasonable rates for the use of poles by not only cable television system operators but also by many other users of wire communications. We understand that, in addition to cable systems, a large number of other entities utilize space on utility poles. These include public safety uses such as police, fire and traffic signalling, in addition to use by communications common carriers such as Western Union.... It seems certain that the scope of a regulatory program designed to insure just and reasonable rates for the leasing of pole space by all of these entities would be much larger than that necessary to insure just rates for cable systems. We would recommend therefore that if the legislative intent of the bill is merely to remedy pole attachment problems which are of importance to the cable television industry, then its application should be so limited, preferably by inserting the term "cable television system" as defined by 47 C.F.R. 76.5(a) in lieu of "wire communication."
 
 
 20
 H.R.REP. NO. 1630 at 30-31. Therefore, it appears the more precise language was used not to circumscribe the scope of communications to be regulated but to limit the type of entity or industry to be protected.[3]
 
 
 21
 Finally, TU notes that in enacting the Cable Communications Policy Act of 1984 ("Cable Act"), 47 U.S.C. § 521, et seq., Congress defined "cable system" as "a facility, consisting of a set of closed transmission paths and associated signal generation, reception, and control equipment that is designed to provide cable service which includes video programming and which is provided to multiple subscribers within a community." 47 U.S.C. § 522(6). Again, TU contends that this limited definition restricts the FCC's pole attachment jurisdiction to cable distributing conventional video programming. But, again, the congressional intent seems far from clear. First, the Cable Act states that the definition of "cable system" applies only "for purposes of" that statute. No reference is made to the PAA. Second, the House Report explains that the
 
 
 22
 term "cable system" is not limited to a facility that provides only cable service which includes video programming. Quite the contrary, many cable systems provide a wide variety of cable services and other communications services as well. A facility would be a cable system if it were designed to include the provision of cable services (including video programming) [302 U.S.App.D.C. 242] along with communications services other than cable service.
 
 
 23
 H.R.REP. NO. 934, 98th Cong., 2d Sess. 44 (1984), 1984 U.S.C.C.A.N. 4655, 4681. Thus, the Commission reasoned that because TCI's facilities were clearly designed to provide traditional cable services including video programming, "its facilities are a 'cable system' within the meaning of the Cable Act, even though TCI also provides data transmission services over its system."
 
 
 24
 In sum, we find TU's attempt to discern in the statutory grant of jurisdiction over "any attachment by a cable television system to a pole" an express requirement that any such attachment be solely for the purpose of transmitting video programming unavailing. It is of course possible that Congress intended to exclude from protection cable attachments used in whole or in part to distribute nonvideo communications. That, however, is not the only or even the most plausible interpretation of the PAA. The Commission may instead be correct that, while Congress did not specifically discuss how to deal with cable carrying video and nonvideo communications, it meant for the agency to regulate pole attachments that are part of a cable company's cable television system, regardless of whether other types of service are being transmitted over that system as well. "If, of course, the interpretive exercise clearly supported one party's interpretation, our task would be at an end. Each side, however, has staked out quite sensible interpretive positions.... Thus, in the [phrase] is to be found that frequently encountered statutory disease, ambiguity." Ass'n of Maximum Serv. Telecasters v. FCC, 853 F.2d 973, 978 (D.C.Cir.1988). We therefore examine next the reasonableness of the Commission's resolution of the ambiguity.
 
 B. FCC's Interpretation
 
 25
 The Commission's decision opened by recognizing that "the language of Section 224 is not necessarily dispositive of the central issue presented" by TCI's complaint. It therefore turned to the statute's legislative history to determine whether its interpretation conflicted with the goals Congress sought to accomplish by enacting the PAA. See Continental Air Lines v. Dept. of Transportation, 843 F.2d 1444, 1452 (D.C.Cir.1988) (agency's construction must not be "patently inconsistent with the statutory scheme") (internal quotations omitted). A principal congressional purpose was to protect cable television companies from the anticompetitive practice by utilities of charging excessive pole attachment rates. Indeed, the Senate Report explains that "[o]wing to a variety of factors, including environmental or zoning restrictions and the costs of erecting separate CATV poles or entrenching CATV cables underground, there is often no practical alternative to a CATV system operator except to utilize available space on existing [utility] poles." S.REP. NO. 580 at 13, 1978 U.S.C.C.A.N. at 121. The report then describes in considerable detail the concerns of the "cable television industry that some utilities have abused their superior bargaining position by demanding exorbitant rental fees and other unfair terms in return for the right to lease pole space." Id. Similarly, the Supreme Court has observed that the PAA was enacted "[i]n response to arguments by cable operators that utility companies were exploiting their monopoly position by engaging in widespread overcharging." FCC v. Florida Power Corp., 480 U.S. 245, 247, 107 S.Ct. 1107, 1109, 94 L.Ed.2d 282 (1987); see also Texas Power & Light Co. v. FCC, 784 F.2d 1265, 1267 (5th Cir.1986); Alabama Power Co. v. FCC, 773 F.2d 362, 364 (D.C.Cir.1985). Therefore, the Commission concluded that its interpretation of the PAA, allowing it to regulate the $95 per pole rate charged by TU, did not do violence to the congressional goal of eliminating monopolistic profits extracted by utilities from cable operators.[4]
 
 
 26
 [302 U.S.App.D.C. 243] Next, the Commission agreed with TU that "a principal goal of Congress in enacting Section 224 was to facilitate the development of traditional cable television services," but rejected TU's deduction that therefore only cable attachments for distributing conventional video programming should be regulated. Rather, as discussed above, the Commission reasoned that Congress was also aware of the potential for "broadband cable services," including data transmission, and the possibility that utilities might in the future compete with cable operators in the nonvideo communications market and use pole attachment rates for an unfair advantage. S.REP. NO. 580 at 13, 1978 U.S.C.C.A.N. at 121. Further, the Commission found evidence that, rather than the type of service to be transmitted over the pole attachments, Congress was interested primarily in the needs of the cable operators themselves. For example, as mentioned previously, Congress' substitution of the phrase "cable television system" for "wire communication" was prompted by a letter from the Commission urging that regulation be limited to cable television system operators and not extended to all users of wire communications. H.R.REP. NO. 1630 at 30-31. Moreover, the Senate Report explains that the PAA was designed to allow the FCC "to exercise regulatory oversight over the arrangements between utilities and CATV systems in any case where the parties themselves are unable to reach a mutually satisfactory arrangement." S.REP. NO. 580 at 15, 1978 U.S.C.C.A.N. at 123. Thus, "the Commission's jurisdictional reach extends only to those entities which participate in the provision of communications space on utility poles." Id. In light of this evidence, and the fact that the statute and legislative history nowhere suggest that attachments for nonvideo communications should go unregulated, the Commission concluded that it could regulate, consistent with the PAA, any attachment by a cable operator so long as it was part of its cable television system and within its cable television franchise.
 
 
 27
 On the other hand, the Commission certainly was not able to come up with any "hard" evidence that Congress wanted or expected the FCC to regulate pole attachments transmitting nonvideo communications. That, however, was not the Commission's burden. Rather, given the ambiguity in the statutory phrase "any attachment by a cable television system," the Commission needed only to offer this court a reasonable interpretation of the PAA. See Chevron, 467 U.S. at 843-44, 104 S.Ct. at 2781-82. In short, the Commission found, based upon the legislative history, that Congress was troubled by allegations that utilities were earning monopolistic profits at the expense of cable companies, and sought broadly to protect cable television system operators rather than merely the provision of conventional cable television service. Therefore, the Commission reasoned that it would be an unreasonable construction of the statute to allow TU to charge TCI the regulated $5 per pole for cables carrying traditional video programming as well as an additional unregulated $90 per pole where some strands within the cables also relayed nonvideo communications. Instead, the Commission held that a utility may only charge a cable television system operator a single, regulated rate regardless of the fact that part of the cable may transmit nonvideo communications. We have no trouble finding this interpretation reasonable, that is, "rational and consistent with the statute." NLRB v. United Food & Commercial Workers Union, 484 U.S. 112, 123, 108 S.Ct. 413, 416, 98 L.Ed.2d 429 (1987).
 
 
 28
 TU, however, disputes this conclusion. First, TU argues that it is illogical for the FCC to regulate pole attachment rates for equipment used to carry nonvideo communications when it does not have jurisdiction to regulate the nonvideo communications themselves. We see nothing anomalous in this result. TU is unable to cite any doctrine that requires the Commission to regulate either both the attachment and the communications carried over the attachment or neither, and we see no good reason why it must. After all, the PAA is aimed at the rates charged for pole attachments, not the content [302 U.S.App.D.C. 244] of the transmissions carried over the attachments.
 
 
 29
 Second, TU asserts that the Commission's interpretation cannot be regarded as reasonable because it will have severe anticompetitive effects. According to the parties, there are three potential classes of competitors in the nonvideo communications market: telephone or electric utilities such as TU which own the poles; cable companies like TCI which must lease space on utility poles; and noncable, nonutility communications carriers like Western Union which also must lease pole space from utilities. Under the Commission's approach, TU and TCI would be on substantially equal footing because TU could only charge a just and reasonable rate for pole attachments. Western Union, because it is not a cable television company, would be at a disadvantage since TU could presumably charge a much higher, unregulated rate. Conversely, if TU prevailed, the utilities would have the upper hand, and both TCI and Western Union would be in the equally disadvantageous position of paying unregulated rates for pole attachments. Based on the scant evidence before us, we cannot say which result, even if forecasted accurately, is optimally competitive. The Commission, however, had to make the choice and we are not in a position on this record to second-guess it. It reasonably determined that Congress intended to address the anticompetitive pole attachment practices of utilities, and therefore it should at least, "enhance[ ] cable operators' ability to compete against utility companies in the provision of data services," even though it "will afford cable television system operators an advantage over other competitors who are not entitled to regulated pole attachment rates under Section 224."
 
 
 30
 Third, and most broadly, TU complains that the Commission's decision must be unreasonable because it allegedly permits any company qualifying as a "cable operator" to attach any type of cable anywhere and still receive the regulated rate. TU argues that basing eligibility for § 224 protection purely on the type of company involved would lead to results that Congress could not have intended when enacting the PAA. For instance, Western Union could be acquired by TCI and its pole attachment rates would suddenly become regulated; or TCI could establish a subsidiary providing purely data transmission in some other state and claim the § 224 regulated rate; or finally, TCI could enjoy the regulated rate for a massive network of cable transmitting nonvideo communications by attaching cable carrying video programming on a handful of poles. We do not believe such fears are well-founded. Though not entirely crystal clear, the Commission's statutory interpretation does offer some discernable limitations.
 
 
 31
 To begin with, the Commission held that "a cable operator may seek Commission-regulated rates for all pole attachments within its system " (emphasis added). In its brief, the Commission reiterates that rates may be regulated only "so long as the attachments are part of a 'cable television system,' " FCC Brief at 18 n. 17, which we know is, at a minimum, a system that "distributes or is designed to distribute to subscribers the signals of one or more television broadcast stations," 47 C.F.R. § 76.5(a). Here, the Commission observed that "TCI is indisputably a cable television system operator within its franchise area." It continued: "We reject [TU's] argument that TCI operates both a cable television system and a separate data network. In our view, the record indicates that data and video are commingled over TCI's transmission facilities, rather than offered over distinct networks." On a petition for reconsideration, the Commission emphasized that its decision had been reached "within the specific factual context" of a system that "provides both traditional (i.e., video) and nontraditional (i.e., data) services on a 'commingled' basis over a single network within its cable franchise area."
 
 
 32
 In addition, the Commission interpreted the PAA as conferring jurisdiction over only those pole attachments within a cable operator's franchise service area. It noted that TCI's "complaint relates only to areas within the scope of its cable television franchise," and that in any event, "pole attachments outside a franchise area are not covered by Section 224." See also Paragon Cable Television, Inc. v. FCC, 822 F.2d 152, 153 (D.C.Cir.1987) (agency's decision that possession [302 U.S.App.D.C. 245] of a cable television franchise is reasonable precondition for pole attachment rights not arbitrary or capricious).[5] Thus, the Commission held that TU "may charge TCI a single, regulated rate for pole attachments within TCI's franchise area."
 
 
 33
 Although it is reasonably clear when an attachment carrying nonvideo communications will be within a cable operator's "franchise area," it is less certain when such an attachment will be "part" of a cable television system or be "commingled" with video services on a "single network." Based on the record, however, we have no reason to doubt the Commission's conclusion that the attachments at issue in this case fit within all of these parameters. But TU asserts that the Commission's interpretation may be more difficult to apply in future cases, and as a result, the interpretation is fatally flawed. While we too can devise difficult hypotheticals, we do not agree that this renders the Commission's interpretation unreasonable. It is the hallmark of the case-by-case, adjudicatory process that the Commission will, under different fact patterns, delineate ever more precisely the boundaries of its statutory construction. As the Commission explained at oral argument, at some point the Commission may find a cable operator's pole attachments to no longer be an "attachment by a cable television system." For instance, in this case, the Commission found that 1705 of the 1788 poles at issue (95%) carried attachments for both video and nonvideo transmissions, while the remaining 83 poles (5%) had attachments for nonvideo communications only; were those percentages reversed, the Commission would need to seriously reassess whether a single, regulated rate would still be appropriate. See, e.g., INS v. Cardoza-Fonseca, 480 U.S. 421, 448, 107 S.Ct. 1207, 1221, 94 L.Ed.2d 434 (1987) (Ambiguous statutory terms "can only be given concrete meaning through a process of case-by-case adjudication. In that process of filling any gap left, implicitly or explicitly, by Congress, the courts must respect the interpretation of the agency to which Congress has delegated the responsibility for administering the statutory program.") (internal quotations omitted).[6]
 
 
 34
 Moreover, we are not convinced that TU's interpretation of the statute--that only pole attachments carrying traditional video programming are eligible for the regulated rate--would be any easier to apply in future cases. According to the Commission, under the Dallas cable television franchise agreement, TCI provides data transmission capacity over its coaxial facilities to local schools, fire and police departments and libraries. TU does not impose a surcharge for these services carried over coaxial cable, but only imposes it for nonvideo communications carried over fiber optic cable. TU offers no basis for its disparate treatment of the two types of cable. Also, we are unsure that the distinction relied upon by TU between video and nonvideo cable attachments can withstand current technological innovations. According to one affidavit in the record, the technology exists for a single fiber strand to carry both video and data communications. And even if we found TU's interpretation of the PAA reasonable, that would not disqualify the FCC's at least equally reasonable construction.
 
 C. Reasonableness of Rates
 
 35
 Finally, TU argues that the Commission erred by failing to conduct an evidentiary proceeding to determine a "just and reasonable" rate where both coaxial and fiber optic cables are attached to a pole. Under the Commission's pole attachment rate regulations, TU had the burden of responding to TCI's complaint with evidence to justify the higher rates. 47 C.F.R. § 1.1407(a). However, the Commission explained, TU offered nothing:[302 U.S.App.D.C. 246] The utility offers no cost justification for the disputed surcharge, nor does [TU] suggest that it incurs any additional costs in preparing or maintaining its poles as a result of TCI's installation of fiber optic cables or TCI's data transmission activities. [TU] does not even dispute TCI's statement that the physical attachment of fiber to the poles is identical to that of coaxial cable.
 
 
 36
 On the basis of that nonshowing, the Commission was not obligated to conduct additional proceedings. As the Commission noted subsequently, "[t]his is not to say that a utility could never adjust upward a regulated pole attachment rate when cables are piggy-backed.... [I]f the utility could make a showing of increased costs that cause the regulated rate to fall outside the bounds of the statutory formula, they could seek relief at the Commission." However, without any contrary evidence, the Commission was left with its undisputed assumption that "the over-lashing of a fiber optic cable onto the aerial support strand along side the coaxial cable still requires only a single attachment to the pole with no additional guying or anchoring," and therefore the rate should "remain the same irrespective of the presence of the additional wire." FCC Brief at 25.[7]
 
 III. CONCLUSION
 
 37
 In this case, the FCC was asked whether it could regulate the pole attachment rates charged by a utility to a cable television system operator for cable attachments carrying nonvideo communications. We agree with the agency that the PAA does not address specifically whether such cables qualify as an "attachment by a cable television system" and thus fall within the FCC's regulatory jurisdiction. However, we also agree that it is consistent with the congressional purpose to avoid abusive pole attachment practices by utilities for the FCC to regulate any attachment by a cable operator within its franchise area and within its cable television system. Therefore, the petition for review is
 
 
 38
 Denied.
 
 
 
 [1]
 In 1989, TU filed suit in district court to collect amounts due under the pole attachment agreement. See Texas Utilities Electric Co. v. Heritage Communications, Inc., CA 3-89-3080-R (N.D.Tex.). That case has been stayed pending resolution of this proceeding
 
 
 [2]
 The FCC has promulgated regulations for making this determination. 47 C.F.R. § 1.1401-1415; see Monongahela Power Co. v. FCC, 655 F.2d 1254 (D.C.Cir.1981) (upholding FCC regulations)
 
 
 [3]
 Although the legislative history offers no insight on the switch in prepositions from "any attachment for wire communication" to "any attachment by a cable television system," we think it buttresses to some degree the view that Congress was seeking to protect cable television systems as entities rather than exclusively cable television service. If the earlier version had been amended to "any attachment for a cable television system," the suggestion would be that only rates for attachments which transmit cable television service should be regulated. The change to the word "by," however, implies that the regulated rate should presumably be afforded to any cable that a cable television system attaches
 
 
 [4]
 We note, without claiming any expertise at determining just and reasonable pole attachment rates, that the annual $95 per pole charged by TU does, at least compared to the rates at issue in previous cases, appear to be decidedly on the high side. For example, see Florida Power Corp., 480 U.S. at 248-49, 107 S.Ct. at 1110 (affirming FCC determination that $7.15 rate per pole was excessive and $1.79 rate was just and reasonable); Texas Power & Light Co. v. FCC, 784 F.2d at 1268 (FCC finding that $3.50 rate per pole excessive and $2.50 rate appropriate vacated and remanded for agency to permit certain costs to be recovered); Alabama Power Co., 773 F.2d at 365 (FCC finding that $3.00 rate per pole excessive and $1.56 rate appropriate vacated and remanded for agency to permit certain costs to be recovered)
 
 
 [5]
 As a result, TCI's pole attachments carrying nonvideo transmissions between Dallas and Plano, Texas, which TU relies upon heavily to support its assertion that TCI operates a data transmission network separate and distinct from its cable television system, were found by the Commission to be outside the scope of this proceeding
 
 
 [6]
 Of course, in raising hypothetical situations, we do not mean to suggest how they should be appropriately resolved. That task is left in the first instance to the agency, if and when it is faced with such issues in concrete cases
 
 
 [7]
 The joint intervenors and amicus, an assortment of electric utilities, trade associations and communications companies, present in their brief a variation of the "takings" argument rejected by the Supreme Court in Florida Power Corp., 480 U.S. at 245, 107 S.Ct. at 1107. TU did not raise this argument on appeal and no one argued it to the Commission below. Therefore, we need not address it. 47 U.S.C. § 405; Illinois Bell Telephone Co. v. FCC, 911 F.2d 776, 785-86 (D.C.Cir.1990); cf. Synovus Financial Corp. v. Board of Governors, 952 F.2d 426, 434 (D.C.Cir.1991)