**OKLAHOMA NATURAL GAS COMPANY, A DIVISION OF ONEOK, INC., Petitioner,**

v.

**FEDERAL ENERGY REGULATORY COMMISSION, Respondent,**

**Amax Gas Marketing, Inc., Natural Gas Pipeline Company of America, Power-Smith Cogeneration Project, Limited Partnership, Williams Natural Gas Company, Intervenors.**

No. 92–1576.

United States Court of Appeals, District of Columbia Circuit.

Argued Feb. 4, 1994.

Decided July 22, 1994.

William I. Harkaway, Washington, DC, argued the cause for petitioner. With him on the briefs were Kathleen Mazure, Washington, DC, Brad D. Fuller and C. Burnett Dunn, Tulsa, OK.

Jerome M. Feit, Solicitor, Federal Energy Regulatory Commission, Washington, DC, argued the cause for respondent. With him on the brief were Susan Tomasky, Gen. Counsel, and Joel M. Cockrell, Attorney, Federal Energy Regulatory Commission, Washington, DC.

On the joint brief for intervenors were John N. Estes, Philip R. Ehrenkranz, Michael T. Mishkin, Harold L. Talisman, Ronald N. Carroll, Washington, DC, and John H. Cary, Tulsa, OK. Priscilla A. Mims, Paul E. Goldstein and Philip R. Telleen, Lombard, IL, entered an appearance for intervenor Natural Gas Pipeline Company of America. Douglas E. Nordlinger, Washington, DC, entered an appearance for PowerSmith Cogeneration Project, Limited Partnership.

Before: BUCKLEY, WILLIAMS and GINSBURG, Circuit Judges.

STEPHEN F. WILLIAMS, Circuit Judge:

For the third time, we review an order of the Federal Energy Regulatory Commission granting a certificate of public convenience and necessity to Williams Natural Gas Company for a 12.4–mile lateral pipeline. Oklahoma Natural Gas Company, a local distribution company that is a rival seller to the customer that the lateral will supply, contests FERC's jurisdiction over the pipeline, claiming that it does not transport gas in interstate commerce. Our earlier doubts answered, we affirm the Commission's exercise of jurisdiction.

\* \* \*

Williams in 1989 sought a certificate under § 7 of the Natural Gas Act, 15 U.S.C. § 717f, to construct, own and operate a lateral pipeline to connect its 16–inch diameter interstate "Cement Pipeline" with the Power-Smith Cogeneration Project Limited Partnership plant. The lateral serves only PowerSmith, pursuant to a transportation agreement among PowerSmith, Amax Gas Marketing, Inc.[1] and Williams. The agreement provides that Williams will transport, on an interruptible basis, gas sold by Amax to PowerSmith under a longterm supply contract. The arrangement is for a "back-haul". Amax injects gas into the Williams pipeline at numerous points in Oklahoma, Kansas and Wyoming, all downstream of the point where the lateral cuts off from the Cement Pipeline. Williams delivers equal amounts of gas to PowerSmith in Oklahoma via the lateral. We assume, as the Commission did, that because the Cement Pipeline originates in Oklahoma, every molecule received by PowerSmith will have originated in Oklahoma.

Oklahoma Natural Gas has consistently contended that the lateral would not transport gas in interstate commerce, defeating Commission jurisdiction. In its first pass at the matter, the Commission rejected the claim in a mere footnote, only to have its decision remanded by this Court for a more adequate explanation. Oklahoma Natural Gas Co. v. FERC, 906 F.2d 708 (D.C.Cir. 1990) ("Oklahoma Natural Gas I "). On remand, FERC elaborated upon its justification, but we remained dissatisfied. Oklahoma Natural Gas Co. v. FERC, 940 F.2d 699 (D.C.Cir.1991) ("Oklahoma Natural Gas II "). This time FERC defended its jurisdiction in an exhaustive order, Williams Natural Gas Co., 59 FERC ¶ 61,306 (1992) ("Second Remand Order"), and we uphold its decision.

\* \* \*

■ In neither of the previous proceedings before this court did FERC invoke Chevron U.S.A., Inc. v. NRDC, 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984), or otherwise claim the deference that Chevron commands for an agency's interpretation of a statute that it is charged with administering. Oklahoma Natural Gas II, 940 F.2d at 704. The Commission now argues explicitly in favor of Chevron deference; Oklahoma Natural Gas resists, on the ground that deference is inappropriate for jurisdictional issues. Although not directly ruling upon the matter of deference on such issues, the Supreme Court has in practice deferred even on jurisdictional issues. See Reiter v. Cooper, —— U.S. ——, ——, 113 S.Ct. 1213, 1221, 122 L.Ed.2d 604 (1993) (applying Chevron to ICC's determination that statute did not grant it "initial jurisdiction ... with respect to the award of reparations"); Commodity Futures Trading Comm'n v. Schor, 478 U.S. 833, 844–45, 106 S.Ct. 3245, 3253, 92 L.Ed.2d 675 (1986) (applying Chevron to scope of the Commission's jurisdiction over counterclaims); NLRB v. City Disposal Systems, Inc., 465 U.S. 822, 830 n. 7, 104 S.Ct. 1505, 1510 n. 7, 79 L.Ed.2d 839 (1984) (pre–Chevron decision expressly rejecting proposition that a different level of deference guides review of "a jurisdictional or legal question concerning the coverage of" the National Labor Relations Act). See generally, Comment, Chevron Deference to Agency Interpretations that Delimit the Scope of the Agency's Jurisdiction, 61 U.Chi.

---

**1.** Amax is in fact a party to the contract by virtue of having acquired Ladd Gas Marketing, Inc., one of the original parties. For simplicity's sake, we refer throughout to Amax.

L.Rev. 957 (1994). So have we. See *Railway Labor Executives' Ass'n v. United States*, 987 F.2d 806, 813 (D.C.Cir.1993) (applying *Chevron* to issue whether provision of Interstate Commerce Act "is an independent source of authority" to modify collective bargaining agreements in a specific class of cases); *Texas Utilities Electric Co. v. Federal Communications Commission*, 997 F.2d 925 (D.C.Cir.1993). In *Texas Utilities* we upheld the FCC's authority, under a statute granting it power over "attachment by a cable television system" to utility poles, to regulate attachments for cables carrying nonvideo services, expressly formulating the issue as whether such cables fell "within the FCC's regulatory jurisdiction." *Id.* at 936.

The exchange between the majority and the dissent in *Railway Labor Executives' Ass'n v. National Mediation Board*, 29 F.3d 655 (D.C.Cir.1994), does not direct a contrary result. There, the majority expressed doubt as to whether the highly deferential model of review under *Switchmen's Union v. National Mediation Board*, 320 U.S. 297, 64 S.Ct. 95, 88 L.Ed. 61 (1943), applied to issues framed as "jurisdictional". 29 F.3d at 663–64. The court ultimately, however, rested the decision on a finding that the Board was reversible on a straightforward application of *Leedom v. Kyne*, 358 U.S. 184, 79 S.Ct. 180, 3 L.Ed.2d 210 (1958), declining—in significant part because of the difficulties of drawing a manageable and principled line between jurisdictional and other issues, see *id.* at 664, which the dissent had also stressed, see Dissent, 29 F.3d at 675–77, to rely on the possible classification of the issue there as jurisdictional. See *Railway Labor Executives' Ass'n*, slip op. at 664. Moreover, the majority explicitly stated that what it had said on the problem of arguably jurisdictional issues in the *Switchmen's* context would have no bearing on conventional review under *Chevron. Id.* at 664 n. 5.

Petitioner argues more narrowly that wherever a federal agency's exercise of authority will preempt state power, *Chevron* deference is inappropriate. But with the exception of negative exercises of federal authority, all agency legal interpretations have some preemptive effect; no state law in direct contradiction will survive. Petitioner's special non-deference principle would therefore have to be applied almost universally, overturning *Chevron.* Alternatively, the issue of deference would turn on a survey of state rules to see if any extant ones happened to succumb under preemption principles. This approach, though less of an onslaught on *Chevron*, would be completely unprincipled, for deference would depend on what rules states happened to have adopted at the moment of review.

Hence, we review FERC's interpretation of its authority to exercise jurisdiction over transportation with the familiar *Chevron* framework in mind.

\* \* \*

Section 1(b) of the Natural Gas Act states that the Act shall apply

 to the transportation of natural gas in interstate commerce, [2] to the sale in interstate commerce of natural gas for resale ..., and [3] to natural-gas companies engaged in such transportation or sale, but shall not apply to any other transportation or sale of natural gas....

15 U.S.C. § 717(b) (brackets added). The Act defines "interstate commerce" as

commerce between any point in a State and any point outside thereof, or between points within the same State but through any place outside thereof, but only insofar as such commerce takes place within the United States.

15 U.S.C. § 717a(7). We must determine whether FERC reasonably determined that the gas delivered by Williams from Oklahoma wells to PowerSmith, also located in Oklahoma, is transported in interstate commerce.

 FERC rests in part on a rather complex argument attributing interstate character to the lateral because of the out-of-state character of the gas supplied by Amax to Williams under the three-way agreement. We pass that, however, because we are persuaded that the Commission's determination is permissible under longstanding precedent embodying a narrower principle—namely

that gas commingled with other gas indisputably flowing in interstate commerce becomes itself interstate gas, even though the gas in question leaves the interstate stream before it crosses any state border.

In the first two proceedings, FERC defended its jurisdiction largely on the basis of *California v. Lo–Vaca Gathering Co.,* 379 U.S. 366, 85 S.Ct. 486, 13 L.Ed.2d 357 (1965). There the Court upheld FERC jurisdiction over wellhead sales of gas to a pipeline that, by contract with a producer (or gatherer), was earmarked for use by the pipeline for its own purposes. The contract earmarked some gas specially for use in the state of production itself, and some for use outside the state of production. See *id.* at 367–68, 85 S.Ct. at 487. The pipeline argued that the sales were therefore not "for resale" and that the gas designated for in-state use was not in interstate commerce at all. Reasoning that "the sale of gas which crosses a state line at any stage of its movement from wellhead to ultimate consumption [is] 'in interstate commerce' within the meaning of the Act," 379 U.S. at 369, 85 S.Ct. at 488, the Court held that the gas sold pursuant to these contracts could not be earmarked "not for resale", because it was commingled with other system supply gas intended for resale which would leave the state.

In the first appearance of this case, we distinguished *Lo–Vaca* on the ground that it rested on the Act's "sale for resale" jurisdiction, not the "transportation" jurisdiction. *Oklahoma Natural Gas I,* 906 F.2d at 711–12. On remand FERC continued to rely on *Lo–Vaca,* asserting in conclusory form that for these purposes there was no meaningful difference between the sales and the transportation jurisdiction. *Williams Natural Gas Co.,* 52 FERC ¶ 61,294 at 62,159 (1990).

Reviewing that assertion, we said that FERC had missed the point, which was that the *consequences* of commingling were different in *Lo–Vaca* from the consequences here. Specifically, we said that jurisdiction over commingled gas had rested on the concept that gas was "dedicated to interstate commerce" whenever it was mixed with jurisdictional gas, and that the dedication concept had been undermined by the intervening

"massive deregulation of gas transportation pursuant to the Natural Gas Policy Act of 1978 and the Commission's promulgation of Orders Nos. 436 & 500." *Oklahoma Natural Gas II,* 940 F.2d at 703. Implicitly we said that the commingling theory was based on a concern that devices such as that employed in *Lo–Vaca* would enable producers to avoid wellhead regulation by artificial earmarking practices, citing *Lo–Vaca*'s own suggestions to that effect. *Id.* (referring to view that the *Lo–Vaca* scheme "was designed artificially to avoid federal jurisdiction"). Finally, we construed a then-recent FERC decision, *Mississippi Valley Gas Co. v. Gulf Fuels, Inc.,* 48 FERC ¶ 61,178 (1989), as itself repudiating the commingling theory. 940 F.2d at 703. Ultimately, we expressed an inability to "understand the Commission's position", *Oklahoma Natural Gas II,* 940 F.2d at 700, and invited it to clarify the grounds on which its jurisdiction rested. We think the Second Remand Order answers the questions that led us to express concern that events had rendered commingling theory obsolete or that the Commission had abandoned it.

1. In its Second Remand Order, the Commission has made clear that the precedent on which it rests is by no means limited to its sales jurisdiction. In *Louisiana Power & Light Co. v. FPC,* 483 F.2d 623 (5th Cir. 1973), the 5th Circuit upheld FERC jurisdiction over the entirety of United Gas Pipe Line's "Green System", which included laterals carrying gas from Louisiana wells to Louisiana industrial users. Second Remand Order, 59 FERC at 62,116. What made the transportation interstate was simply that some of the gas in the system, prior to its diversion to laterals, was destined for out of state. *Louisiana Power,* 483 F.2d at 627–28. (Where the court refers to "interstate gas" being injected into the Green System, *id.* at 627, it plainly refers to gas that is interstate solely by virtue of being headed ultimately across the border, for otherwise the court could not find on the next page that all the gas was "produced within Louisiana and had never been physically outside the state", *id.* at 628.) The consequence was to subject to FERC jurisdiction all United's deliveries from the Green System of gas produced in

Louisiana and delivered to Louisiana industrial users, even though none of such gas would under any circumstances cross a state line. See *Louisiana Power,* 483 F.2d at 625–26; *FPC v. Louisiana Power & Light Co.,* 406 U.S. 621, 92 S.Ct. 1827, 32 L.Ed.2d 369 (1972).

The Commission also cited *Public Service Commission of Kentucky v. FERC,* 610 F.2d 439 (6th Cir.1979), see Second Remand Order, 59 FERC at 62,111–12, for the proposition that where a pipeline receives gas in one state, makes some deliveries therein, and then carries the remainder across the border into another, the entire volume of natural gas in question "begins its journey in interstate commerce at the wellhead." 610 F.2d at 444. Thus the court found that such a pipeline could not make deliveries from the pipeline in the state of origin without obtaining a certificate of convenience and necessity from the Commission. *Id.* The language of *Public Service Commission* makes explicit what was implicit in *Louisiana Power*—that there can be no contention that transportation acquires an interstate character only at the point where molecules first cross a state line (or at a point where all molecules in the pipeline are headed out of state), so that a two-state interstate pipeline would be interstate only in the state of delivery (or the state of delivery plus that portion in the state of origin beyond which all gas was bound out of state). Thus, established precedents make clear that the Cement Pipeline is interstate from start to finish. See also *Mississippi Valley Gas Co. v. Gulf Fuels, Inc.,* 48 FERC ¶ 61,178 at 61,656 (1989) (finding the transportation of gas produced and consumed in Mississippi jurisdictional *while in its interstate facilities* ). We return below to whether one might carve the PowerSmith lateral off from the Cement Pipeline for jurisdictional purposes, but before doing so will address the Commission's reasons for asserting the continued validity of the commingling theory.

2. The Commission explained on remand why developments since such cases as *Lo–Vaca* and *Louisiana Power* have not mooted their analysis. Second Remand Order, 59 FERC at 62,117. It pointed out that in fact

neither the NGPA nor Order Nos. 436 and 500 effected a deregulation of "gas transportation", as we supposed in *Oklahoma Natural Gas II.* The NGPA started a process of deregulation of wellhead sales, which was completed by enactment of the Wellhead Decontrol Act in 1989, Pub.L. No. 101–60, 103 Stat. 157 (1989). The orders in question, while establishing authority for "blanket" certifications (i.e., certifications generically covering a wide range of transactions), were far from deregulatory, a point manifested by the welter of open-access regulations contained in part 284 of the Commission's regulations. See 59 FERC at 62,117.

In any event, insofar as *Oklahoma Natural Gas II* questioned whether the Commission's view of its jurisdiction could be reconciled with evolving circumstances in the natural gas industry, we believe the Commission has answered the concern in its discussion of the question of laterals *delivering* gas to end-users, and specifically of the *Gulf Fuels* case, to which we now turn.

3. In *Oklahoma Natural Gas II* we laid considerable stress on *Mississippi Valley Gas Co. v. Gulf Fuels, Inc.,* 48 FERC ¶ 61,-178 (1989), citing it (and *Natural Gas Pipeline Co. of America,* 40 FERC ¶ 61,119 (1987)) for the proposition that the Commission regularly determined that "branch pipelines extending off interstate trunk lines are engaged in intrastate transportation." 940 F.2d at 702 n. 4. Further, to the Commission's response that the lateral in *Gulf Fuels* was owned by the consuming firm, we said that "it is not clear why ownership of the branch line should be determinative in deciding whether the 'gas' is transported interstate." *Id.* We also read *Gulf Fuels* as rejecting "the theory that commingled gas is necessarily 'dedicated to interstate commerce' ". *Id.* at 703.

The Commission's response took two forms. First, it argued that the Act made ownership per se important, as was shown by the fact that ownership was critical to application of the so-called "Hinshaw" exception, § 1(c) of the NGA, 15 U.S.C. § 717(c). See Second Remand Order, 59 FERC at 62,118. Second, it argued that as a practical matter a branch line "owned and operated by a single

jurisdictional pipeline ... is necessarily *integrated* into an interstate system, and hence inherently has the jurisdictional attributes which an unaffiliated, unintegrated branch line does not." *Id.* Cf. *Louisiana Power,* 483 F.2d at 634 (noting integration of formerly intrastate system with interstate system, under control of "one person"). The Commission went on to develop the practical factors (discussed below).

That Congress recognized the importance of ownership in creating a specific exception to the Commission's jurisdiction seems to us of limited importance. Of course one might suppose that a difference in ownership is presumptively important, as ownership normally entails the power, subject to qualifications, to control the use of the property in question. Indeed, one might expect that all except those completely enmeshed in the administrative state would normally presume ownership to be important. But the congressional limitation of the Hinshaw exception to pipelines owned by persons other than an interstate pipeline only becomes seriously convincing if one can perceive that the reasons for its importance there apply here as well. That turns on the Commission's discussion of the practical importance of a single firm's owning and operating a lateral in conjunction with its indisputably jurisdictional pipeline.

On that subject, the Commission wrote: As a result of this integration, Williams is able to maintain system balancing maintenance and curtailment practices on the lateral pipeline, and to operate the pressure and flow characteristics of the pipeline in a manner consistent with its overall interstate requirements.

The integration of the lateral pipeline into Williams' system also enables Williams to ensure a continuity of service through the pipeline and to achieve economies of scale in a manner which would not be possible were the pipeline owned by someone else. For instance, Williams states that PowerSmith is able to receive service on days when flowing upstream supplies

are inadequate because of its integration with Williams' system, including the South of Blackwell line. The coordinated operation of the lateral pipeline with Williams' mainline system, as evidenced by flow reversals and improved capacity of the mainline, fully demonstrates the integration of the lateral into Williams' system. In addition to the ownership distinction, these circumstances distinguish the instant case from *Gulf Fuels.*

59 FERC at 62,118 (citations deleted).

As operator of an integrated interstate pipeline, then, Williams can use the PowerSmith lateral to meet the needs of its *interstate* customers (at least it can so long as it is not subject to *state* regulatory control and attendant conflicts with FERC's jurisdiction over the trunk, such as might arise if Oklahoma Natural Gas's position were upheld). A pipeline is not just an artery of gas transportation; it has inherent storage capacity, to be exploited by adjusting the pressure in the line. See, e.g., *Tennessee Gas Pipeline Co.,* 65 FERC ¶ 61,224 at 62,057 (1993) ("Managing instantaneous no-notice service demands requires *system-wide* operational responses (through the use of line pack or production area storage)") (emphasis added). FERC's allusion to "flow reversals" suggests more—that the very notions of "downstream" and "upstream" may be arbitrary and unrealistic. Even without the flow reversals, however, we think that protection of Williams's ability to use the PowerSmith lateral to make optimal decisions for provision of service to its interstate customers amply explains, under the specific circumstances, why Commission jurisdiction should attach. The capacity of Williams as single owner of an integrated system, moreover, distinguishes not only *Gulf Fuels* but most other cases denying jurisdiction over delivery laterals owned and controlled by persons other than an interstate pipeline.[2] See *Public Service Electric & Gas Co. v. FPC,* 371 F.2d 1, 3, 5 (3d Cir.1967); *Natural Gas Pipeline Co. of America,* 40 FERC ¶ 61,119 at 61,325 (1987); *Colorado Interstate Gas Co.,* 49 FPC 648

2. A pipeline might by contract attain integrated control over a lateral owned by another. In that event, the above reasoning would appear to render the lateral jurisdictional, but we need not address that issue now.

(1973); but see *Colorado Interstate Gas Co.*, 56 FPC 1916 (1976).[3]

Finally, it is true that in *Gulf Fuels* the Commission broadly observed that "[i]n recent years, with the deregulation of producer sales, the concept of 'dedication to interstate commerce' has largely lost its significance." 48 FERC at 61,656–57 n. 16. In important aspects, the assertion is indisputable. Wellhead price controls no longer drive a wedge between prices in the intrastate and interstate markets. Consequently, no longer need producers strive to avoid entrapment in the interstate market, and no longer need consumer interests seek to prevent withdrawal of dedicated gas. See, e.g., *California v. Southland Royalty Co.*, 436 U.S. 519, 98 S.Ct. 1955, 56 L.Ed.2d 505 (1978) (where holder of 50–year leasehold in gas had committed gas to interstate market, reversion owners' interests in the gas were, on conclusion of the lease, subject to Commission jurisdiction and dedicated to interstate market). But the Commission has adequately explained in its Second Remand Order why its jurisdiction over the totality of a single firm's interstate gas transportation network, of which the PowerSmith lateral was clearly a part, continues to be a reasonable reading of the statute. We note that in *Gulf Fuels* the Commission found that "the transportation that Tennessee [a jurisdictional pipeline] provides through its interstate facilities *is* jurisdictional and subject to regulation by this Commission," 48 FERC at 61,656, even though every molecule of the gas delivered by Tennessee to the independent lateral was "produced, sold, and consumed in the state of Mississippi", *id.*

\* \* \*

Petitioners also argue that the Commission erred by failing to reopen the proceeding to consider their claim that the Oklahoma franchise law is an unconstitutional burden on interstate commerce and preempted by the Natural Gas Act. This repeats a contention made and rejected in *Oklahoma Natural Gas*

*II*, 940 F.2d at 704, with the only new wrinkle being that since then the Commission itself reopened the record on one issue—the jurisdictional issue—pursuant to our remand; if reopening for *A*, why not for *B?* We do not think that distinction enough to render the Commission's refusal an abuse of discretion under the extremely deferential terms of review applicable to such a decision. See *id.*

Accordingly, the petition for review is

*Denied.*

---

**3.** The latter Commission decision, issued after *Lo–Vaca* and the Fifth Circuit's opinion in *Louisiana Power*, appears inconsistent with those cases and with the Commission's view here. It offers no analysis justifying departure from the previously established interpretation. Cf. *Maislin Industries v. Primary Steel*, 497 U.S. 116, 131, 110 S.Ct. 2759, 2768, 111 L.Ed.2d 94 (1990) (under the doctrine of *stare decisis* pre-*Chevron* interpretation of clear meaning of Interstate Commerce Act trumped subsequent agency effort to execute policy change).