ALTAMONT GAS TRANSMISSION COMPANY, et al., Petitioner,

v.

FEDERAL ENERGY REGULATORY COMMISSION, Respondent,

Great Lakes Gas Transmission Limited Partnership, Intervenor.

Nos. 91–1369, 93–1241, 93–1295, 93–1308, 93–1309 and 93–1317.

United States Court of Appeals, District of Columbia Circuit.

Argued Nov. 14, 1995.

Decided Aug. 23, 1996.

1240

Roger A. Berliner, Washington, DC, argued the cause for petitioners Indicated Expansion Shippers and Frederic G. Berner, Jr., Washington, DC, argued the cause for petitioners Altamont Gas Transmission Company, et al., with whom Jane E. Stelck and James F. Bendernagel, Jr., Washington, DC, for petitioners Altamont Gas Transmission Company, et al., Thomas D. Oliver, Houston, TX, for petitioner Chevron U.S.A. Inc., and John Leslie, for PanCanadian Petroleum Company, et al., were on the joint briefs. David R. Stevenson, New Orleans, LA, entered an appearance for petitioner Chevron U.S.A. Inc.

Mark Fogelman, San Francisco, CA, argued the cause for petitioner Public Utilities Commission of the State of California, with whom Edward W. O'Neill was on the briefs.

Michael F. McBride, Washington, DC, argued the cause for petitioner and intervenor Pacific Gas Transmission Company, with whom Elias G. Farrah, Bruce W. Neely, Washington, DC, Keith T. Sampson, Portland, OR, Joseph H. Fagan and Michael J. McDanold, Washington, DC, were on the briefs. Jack F. Fallin, Frank R. Lindh, Howard V. Golub, Patrick G. Golden, David W. Anderson, San Francisco, CA, and Raymond N. Shibley, Washington, DC, entered appearances.

Timm L. Abendroth, Federal Energy Regulatory Commission, argued the cause for respondent, with whom Jerome M. Feit, Solicitor, and Randolph L. Elliott, were on the brief. William S. Scherman, Washington, DC, entered an appearance.

James C. Moffatt, Shippen Howe and John R. Staffier, Washington, DC, entered appearances for intervenors Foothills Pipe Lines Ltd., et al. David L. Huard, Los Angeles, CA, entered an appearance for intervenor Southern California Gas Company.

Thomas B. Magee, Washington, DC, Frederick T. Kolb, New Orleans, LA, and Jon L. Brunenkant, Washington, DC, entered appearances for intervenors Amoco Production Company and Amoco Canada Petroleum Company Ltd. Kenneth L. Glick and Narinder J. Kathuria, Detroit, MI, entered appearances for intervenor Great Lakes Gas Transmission Limited Partnership. Jennifer B. Corwin, Washington, DC, entered an appearance for intervenor Southern California Edison Company. Britton White, Jr., El Paso, TX, Charles G. Fox, Albany, NY, Mark F. Sundback, Washington, DC, and Phillip D. Endom, El Paso, TX, entered appearances for intervenor El Paso Natural Gas Company.

Thomas D. Clarke, Oakton, VA, entered an appearance for intervenor Pacific Interstate Transmission Company. David P. Yaffe, Los Angeles, CA, entered an appearance for intervenor Northern California Power Agency. Norman A. Pedersen, Los Angeles, CA, entered an appearance for intervenors Southern California Utility Power Pool and Imperial Irrigation District. Keith L. Kutler, Salem, OR, entered an appearance for intervenor Oregon Public Utility Commission. David R. Stevenson entered an appearance for intervenor Chevron U.S.A. Inc.

Before: GINSBURG, ROGERS and TATEL, Circuit Judges.

GINSBURG, Circuit Judge:

The Federal Energy Regulatory Commission authorized petitioner Pacific Gas Transmission to build and operate a pipeline from the Canadian border to the Oregon–California border at Malin, Oregon, where it connects to the intrastate facilities of PGT's parent, Pacific Gas & Electric. The Califor-

nia Public Utilities Commission, also a petitioner, authorized PG&E to expand its facilities in order to receive the new gas from PGT for distribution within California.

Because it determined that the rate structure proposed by PGT–PG&E discriminated against interstate shippers seeking access to the California market via PGT–PG&E's facilities, the Commission initially postponed the start of PGT's construction. In order to meet increased demand for gas, however, the Commission subsequently authorized PGT to begin construction but lowered the pipeline's allowed rate of return to 10.13% from 12.75% until PGT could demonstrate that its rates and policies no longer discriminated against interstate shippers.

Petitioners Altamont Gas Transmission and other interstate shippers (collectively, the Expansion Shippers), which compete with PG&E to sell gas in California, support the Commission's exercise of jurisdiction in this case. They contend, however, that the PGT–PG&E arrangement is unduly discriminatory; the Commission should not have certificated PGT's expansion in its present form; and the rate of return adjustment ordered by the Commission is arbitrary and capricious.

Both PGT and the CPUC contend that by imposing the rate of return condition the Commission exceeded its jurisdiction, and they deny that the CPUC's rate orders sanction anticompetitive or unduly discriminatory acts. For its part, PGT supports the Commission's decision to lift the original construction ban but argues that the rate of return condition is an unreasonable penalty that is unsupported by the record and unconnected to PGT's allegedly discriminatory acts.

■ We hold that the Commission did indeed overstep its jurisdictional bounds, interfering in an area that the Congress has expressly reserved to the states. Accordingly, we do not decide whether the PGT–PG&E arrangement is unduly discriminatory, nor whether the Commission should have certificated PGT's expansion in its present form, nor whether the Commission's decision to adjust PGT's rate of return is arbitrary and capricious.*

## I. Background

In January 1991 the Commission preliminarily authorized PGT to build and operate a pipeline from the Canadian border to Malin, Oregon, subject to two conditions: First, PGT would have to offer its new transportation capacity to all shippers rather than allocate the bulk of the capacity to California utilities before offering it to interstate shippers. Second, PGT would have to revise its contractual relationships with the Expansion Shippers to eliminate a "tie-in" that required them to use PG&E's expansion facilities within California. The tie-in subjected the Expansion Shippers to circuitous routing and higher overall rates in order to transport their gas to its final destination. Expansion Shippers serving northern California could not take delivery of their gas at Malin; instead, they had to pay for transportation to PG&E's Kern River Station in southern California and then pay a separate charge on PG&E's intrastate system for transportation back to northern California.

The Commission agreed that once PGT satisfied the two conditions, it could proceed with construction under an approved rate structure that included a return on equity of 12.75%—not far from the midpoint of the 10.13–15.80% "zone of reasonableness." Sub-

---

\* We do have one housekeeping matter to resolve: PGT asks that a certain requirement in the Commission's January 1991 order be vacated as moot. The Commission initially directed PGT to use a 95% load factor in designing its usage charge. Later the Commission authorized PGT to use a demand-based rate design instead of a usage-based design. Thus PGT's load factor became a non-issue and, for that reason, the Commission did not vacate the requirement. The Supreme Court has held that a moot agency directive should be vacated in order to clear the path for relitigation and to remove an unre-

viewed judgment. *United States v. Munsingwear, Inc.,* 340 U.S. 36, 39–40, 71 S.Ct. 104, 106–07, 95 L.Ed. 36 (1950). The Commission, however, points out that PGT did not raise this issue in its request for rehearing of the August order. Instead, PGT simply asked the Commission to "clarify that this throughput component no longer exists." Therefore, asserts the Commission, PGT cannot raise the question on appeal. *See* 15 U.S.C. § 717r(b). Under the circumstances, this is an excessively fastidious reading of PGT's request for rehearing. We hereby vacate the load factor requirement.

sequently, PGT did in fact comply with both conditions, altering its initial capacity allocation and making gas available for delivery at Malin by eliminating the contractual requirement that Expansion Shippers use PG&E's expansion facilities.

In August 1991 the Commission issued PGT a certificate, but the certificate did not authorize PGT to begin construction immediately. Rather, the FERC expressed continuing concern over decisions of the CPUC that, in the Commission's view, effectively perpetuated the tie-in between the new PGT pipeline and PG&E's expansion facilities. First, the CPUC had required the Expansion Shippers to use PG&E's expansion facilities before they could "cross over" to its pre-existing facilities. Second, the Expansion Shippers had to pay PG&E a flat (so-called postage stamp) rate for use of its expansion facilities regardless of the distance over which they shipped and then pay an additional demand charge to reserve delivery capacity on the existing system from Kern River to northern California (a so-called double backbone transmission charge). The Commission concluded that these state regulatory requirements embedded in PG&E's rate structure were anticompetitive, just as PGT's original contractual tie-in had been. The Commission refused to allow PGT to go forward with construction until the pipeline guaranteed nondiscriminatory treatment to interstate shippers.

PGT and several of its customers then requested that the Commission allow construction to begin so that PGT could meet the increasing market demand for gas. The CPUC also asked the Commission to allow construction to proceed, but on the ground that the FERC could not lawfully condition PGT's certificate upon a change in PG&E's intrastate rates. The Expansion Shippers, however, opposed the Commission's lifting the condition until PGT provided assurance that the tie-in would be eliminated. In October 1991 the Commission permitted construction to go forward in order to satisfy the growing demand for gas but it reduced PGT's return on equity to 10.13%, the low end of the zone of reasonableness, until PGT eliminated undue discrimination against interstate shippers.

PGT, the CPUC, and Altamont, an interstate natural gas pipeline, all requested rehearing of the August order; PGT and the Expansion Shippers requested rehearing of the October order. In March 1993 the Commission denied all rehearing requests. Although the CPUC had by then eliminated the double backbone portion of PG&E's transmission charge, the Commission concluded that this change alone "d[id] not provide a sufficient remedy." The Commission expressed particular concern that, because of the crossover prohibition and PG&E's postage stamp rate, an interstate shipper that used PGT's new pipeline could not get the benefit of the lower rate PG&E charged for use of its pre-existing facilities even if capacity became available on those facilities. In conditionally lowering the return that PGT was authorized to earn on its new pipeline, the Commission hoped to "accommodate and balance conflicting objectives by permitting construction to go forward along with providing an appropriate incentive to continue to work to eliminate undue discrimination."

Section 7 of the Natural Gas Act, 15 U.S.C. § 717f, prohibits the construction of certain natural gas pipeline facilities without a certificate of public convenience and necessity issued by the Commission; section 7(e) authorizes the Commission "to attach to the issuance of the certificate and to the exercise of the rights granted thereunder such reasonable terms and conditions as the public convenience and necessity may require." PGT contends that the Commission exceeded its authority under § 7(e) by conditioning PGT's certificate upon the pipeline earning the minimum reasonable rate of return, 10.13%.

The Hinshaw Amendment, § 1(c) of the NGA, 15 U.S.C. § 717(c), provides that intrastate rates and services, such as those of PG&E in this case, are exempt from Commission scrutiny. The amendment applies to any state-regulated pipeline that receives interstate gas "within or at the boundary of a state if all of the gas so received is ultimately consumed within such state." Both the CPUC and PGT argue that under the

amendment the CPUC retains exclusive authority over the rates, services, and facilities of PG&E; accordingly, by conditioning PGT's certificate upon a change in PG&E's practices the Commission was attempting to do indirectly what it could not do directly.

In exercising its supervisory authority over PG&E's rates, the CPUC directed the company to adopt an incremental rate structure—that is, one in which the added cost of the expansion facilities is assessed against expansion customers only (as opposed to a "rolled-in" rate that recovers the cost of both old and new facilities from old and new customers alike). According to the CPUC, only the use of incremental rates assures that expansion customers, for whose benefit the new facilities were constructed, pay the cost of those facilities. As the CPUC points out, "[w]ithout a requirement such as the crossover ban, some incremental volumes would migrate to existing facilities" thereby circumventing the policy underlying the incremental rate structure. Finally, a postage stamp rate is equitable as applied to the shipments destined for northern California, according to the CPUC, because the expansion facilities would not have been built but for the need to serve the increased demand for gas in southern California; absent that demand, "[s]hippers wishing to deliver gas ultimately to northern California would have no means of bringing additional Canadian gas into the state."

The Commission acknowledges that an incremental rate structure allocates the cost of a new facility to the customers who benefit from using it. On the facts of this case, however, the Commission suggests that an incremental rate structure would be unduly discriminatory because it would require interstate shippers to pay a higher rate for the intrastate expansion facilities than is warranted by the mileage they use. Therefore, the Commission wants PG&E to (1) adopt a rolled-in structure, or (2) eliminate the crossover ban, or (3) abandon its postage stamp rate in favor of a rate that varies with mileage. Because PG&E has not taken one or more of these steps, the Commission maintains that PG&E obtains an unfair advantage over interstate shippers that use PG&E's

facilities but are also its competitors for sales in the California market. Because it pays a non-distance-sensitive rate, a shipper selling gas in northern California subsidizes the companies that serve the southern California market, which is further from Malin. That same shipper would also appear to be put at a competitive disadvantage relative to PG&E in northern California; the fixed rate the shipper pays for the use of PG&E's expansion facilities exceeds PG&E's cost (as reflected in the rate) for the use of its older facilities.

## II. Analysis

As a threshold matter, the Commission contends that the CPUC does not have standing to seek review of the August and October 1991 orders. In the case of the August order the CPUC got what it wanted—the Commission lifted the construction ban that had been in effect against PGT—and in the case of the October order the CPUC did not seek rehearing, which is a jurisdictional prerequisite for judicial review. The CPUC responds that it challenged the August order with respect both to the construction ban and to the Commission's underlying finding of undue discrimination and, in this latter regard, that order continues to impede the CPUC in its exercise of regulatory authority. Additionally, the CPUC asserts that it is not required to seek rehearing of a supplemental order that leaves intact the pertinent parts of a prior order of which it did request rehearing.

We take no position on this question of standing. The CPUC asks for relief that is in all relevant respects congruent with the relief requested by PGT, and for the same underlying reason. Because we grant PGT's petition in sufficient part to give the CPUC all the relief it seeks, and because the other issues that the CPUC raises are not necessary to our disposition of this case, whether the CPUC has standing is of no consequence.

We begin our analysis of the Commission's jurisdictional bounds with an inquiry into the applicability of the Hinshaw Amendment to affiliated companies. Then we examine the principal contention of PGT and the CPUC—that the Commission interceded in an area

expressly reserved to the states. Section 1(c) of the NGA, 15 U.S.C. § 717(c), is of course central to both questions. It provides in relevant part:

> The provisions of [the NGA] shall not apply to any person engaged in or legally authorized to engage in the transportation in interstate commerce or the sale in interstate commerce for resale, of natural gas received by such person from another person within or at the boundary of a State if all the natural gas so received is ultimately consumed within such State, or to any facilities used by such person for such transportation or sale, provided that the rates and service of such person and facilities be subject to regulation by a State commission. The matters exempted ... by this subsection are declared to be matters primarily of local concern and subject to regulation by the several States.

### A. The Applicability of the Hinshaw Amendment to Affiliated Companies

■ According to the Expansion Shippers, the PGT–PG&E pipeline is a single, integrated interstate transmission facility owned in part directly and in part indirectly by PG&E. When the CPUC required interstate shippers to use PG&E's expansion facilities before crossing over to its pre-existing facilities, PGT and PG&E (with the help of the CPUC) were able to bifurcate their expansion project into an interstate component subject to regulation by the Commission and an intrastate component which evaded federal supervision. This duality sheltered PG&E from the competition of the interstate shippers notwithstanding that the "Congress did not intend the [Hinshaw Amendment] to relieve the Commission of jurisdiction over local branches of integrated interstate systems." *Louisiana Power & Light Co. v. FPC*, 483 F.2d 623, 633 (5th Cir.1973).

Altamont takes the position that, on the facts of this case, the Hinshaw Amendment does not even apply to PG&E. Because PGT and PG&E are effectively one and the same company (according to Altamont) their transfer of gas at the Oregon–California border does not satisfy the threshold requirement of § 717(c) that gas be received by one person "from another person."

The Commission, however, found that although the PGT–PG&E expansion was coordinated as to management, financing, and contracting, their integration in these areas did not make the two companies into one for the purpose of the NGA. In its August order, the Commission concluded that without proof of undue discrimination there is "nothing inappropriate about such coordinated activities," and Altamont did not demonstrate that the areas of coordinated activity were the source of such undue discrimination as the agency had identified.

In past decisions the Commission has arguably taken a harder look at nonjurisdictional services provided by the affiliate of an interstate pipeline. *See, e.g., Arkla Gathering Servs. Co.*, 69 FERC ¶ 61,280 at 62,087 (1994) (Commission may treat jurisdictional pipeline and nonjurisdictional gatherer as single entity where services are tied), *aff'd in relevant part, Conoco Inc. v. FERC*, 90 F.3d 536 (D.C.Cir.1996). In the recent case of *KansOk Partnership*, 73 FERC ¶ 61,160 (1995), the Commission held that it would treat three affiliated pipelines as a single interstate system because their corporate structure was designed specifically to avoid federal regulation. *Id.* at 61,486. "[W]here it is necessary to protect the public interest," the Commission said, it "will disregard the separate corporate status of entities that would otherwise be considered nonjurisdictional." *Id.* at 61,484. Closer in point is another decision issued the same day as *KansOk*, in which the Commission found that three affiliates—including a Hinshaw pipeline—that had coordinated their construction proposals constituted an interstate pipeline subject to the NGA. *Louisiana Gas Sys. Inc.*, 73 FERC ¶ 61,161 (1995). The Commission indicated that the jurisdictional status of any one of the pipelines might not have been an issue, but because "the actual effect of the construction project contemplated here will be to give pipeline affiliates a competitive advantage in the transportation of gas ... this would subvert the purposes of the NGA." *Id.* at 61,502. The Commission determined not to allow the companies "to bal-

kanize into a chain of affiliates subject to the regulations of various states." *Id.* at 61,503.

Given a proper evidentiary record, the Commission might have avoided any Hinshaw constraint upon its jurisdiction by concluding that PGT and PG&E undertook this project as a single company. The Commission did not reach this conclusion, however, and the court cannot on this record hold that the Commission was unreasonable—that is, that PGT and PG&E unduly discriminated against interstate shippers by coordinating their activities. We are of course mindful that the Commission's choice not to pursue a given line of inquiry "often involves a complicated balancing of a number of factors which are peculiarly within [the agency's] expertise." *Heckler v. Chaney,* 470 U.S. 821, 831, 105 S.Ct. 1649, 1655–56, 84 L.Ed.2d 714 (1985). We therefore treat PGT and PG&E as distinct companies, as did the Commission, for purposes of the Hinshaw analysis.

*B. The Commission's Consideration of Nonjurisdictional Issues*

■ Next, we turn to the argument, advanced both by PGT and by the CPUC, that under the Hinshaw Amendment the Commission lacks the power to condition a certificate of public convenience and necessity upon an interstate pipeline's intrastate affiliate changing its rate structure. We have held that the Commission may not use the conditioning authority of § 7(e) to circumvent a limitation imposed upon its ratemaking authority by §§ 4 and 5 of the NGA, nor *a fortiori* to do anything that is specifically proscribed by the Act. *American Gas Ass'n v. FERC,* 912 F.2d 1496, 1510 (1990) (*AGA*). *See also Northern Natural Gas Co. v. FERC,* 827 F.2d 779, 781 (1987) (en banc). The CPUC and PGT contend that the Hinshaw Amendment puts PG&E's intrastate rates outside the Commission's legitimate area of concern. Both PG&E's postage stamp rate and its crossover ban are, in effect, rate policies approved or required by the CPUC. The crossover ban is a bookkeeping, not an operating, convention; regardless how the gas flows through the existing and the expansion facilities, a new user is billed at the rate applicable to the new facilities while an existing user is billed at the rate applicable to existing facilities. That is why, as the Commission acknowledged, a rolled-in rate would render the crossover ban irrelevant.

■ Because they are elements of PG&E's rate design, both the postage stamp rate and the crossover ban are within the jurisdiction of the CPUC. Yet in its March 1993 order denying rehearing, the Commission described the CPUC's decision to eliminate the double backbone portion of PG&E's transmission charge while retaining both the postage stamp rate and the crossover ban as "not provid[ing] a sufficient remedy" to satisfy the FERC that PG&E's rates were not unduly discriminatory. Then, recognizing that it could not lawfully regulate PG&E's rates, the Commission moved indirectly but frankly to "induc[e] a change to a policy beyond [its] jurisdictional purview" by attaching a rate-of-return condition to PGT's certificate. Although the Commission has broad authority to consider all relevant factors in deciding whether and upon what terms to issue a certificate, the rate structure of an affiliated Hinshaw pipeline is not a relevant factor. On the contrary, in § 717(c) the Congress expressly withdrew it from the purview of the agency.

■ In *FPC v. East Ohio Gas Co.,* 338 U.S. 464, 467, 70 S.Ct. 266, 268, 94 L.Ed. 268 (1950), the Supreme Court held that a company receiving gas at a state border from an interstate pipeline and transporting that gas for sale within the state is engaged in interstate commerce subject to the NGA. The Hinshaw Amendment was intended to overrule *East Ohio* in part by foreclosing Commission jurisdiction over the rates, services, and facilities within the state where the gas is finally consumed—they are "declared to be matters primarily of local concern"—so long as a state regulatory authority assumes such jurisdiction. According to the CPUC, the appropriate way for the Commission to assert its interests is therefore to appear before the CPUC, just as the CPUC appears before the FERC in matters within the Commission's jurisdiction. Alternatively, the Commission may institute federal-state cooperative procedures under 15 U.S.C.

§ 717p(b). The Commission took neither course here.

The Commission counters that its action was confined to lowering the rates charged by PGT for interstate transportation—clearly a subject matter within its jurisdiction. The agency asserts that it simply created an incentive (by conditionally reducing PGT's rate of return) for the CPUC and PG&E to behave in a manner that advances the public interest, *i.e.*, to revise PG&E's rate structure. *See AGA*, 912 F.2d at 1511 (Commission may "establish[ ] certificate conditions with an eye to inducing changes in transactions that are beyond its direct grasp"). According to the Commission, while the Hinshaw Amendment restricts its "primary grant of jurisdiction over interstate transportation and sales for resale," it does not restrict the Commission's authority to consider a nonjurisdictional matter—even one subject to state regulation—if it is relevant to an issue within its immediate domain. *See, e.g., Maryland People's Counsel v. FERC*, 761 F.2d 780, 786–87 (D.C.Cir.1985) (Commission may consider anticompetitive effect of nonjurisdictional activity).

The Commission invokes two Supreme Court cases in support of its position. In *FPC v. Transcontinental Gas Pipe Line Co.*, 365 U.S. 1, 81 S.Ct. 435, 5 L.Ed.2d 377 (1961) (*Transco*), the Supreme Court upheld the Commission's denial of a certificate for transportation of gas to be sold at retail, although such sales are not subject to regulation by the Commission. The Court reasoned that the price at which the retail sales would be consummated might occasion an escalation in the price of certain wholesale transactions that were within the Commission's jurisdiction. *Id.* at 7, 81 S.Ct. at 438–39. In *FPC v. Conway Corp.*, 426 U.S. 271, 96 S.Ct. 1999, 48 L.Ed.2d 626 (1976), an electric utility engaged in both (jurisdictional) wholesale interstate sales and in (nonjurisdictional) industrial retail sales. Some of the utility's wholesale customers competed against the utility by reselling the gas to industrial users. These customers alleged that the wholesale price was inflated to prevent them from competing for the retail business. The Court held that the Federal

Power Act authorized the Federal Power Commission to examine the entire factual context surrounding the wholesale rates, including facts related to the nonjurisdictional retail transactions. *Id.* at 280, 96 S.Ct. at 2005.

The pivotal question raised in the present case is not whether the Commission has jurisdiction over a Hinshaw pipeline—the Commission concedes that it does not—but whether the Commission may exercise its power over an interstate pipeline in a manner intended to influence a state agency's regulation of a Hinshaw pipeline. In *Conway* the Supreme Court precisely delineated the Commission's authority to explore the jurisdictional implications of a nonjurisdictional transaction; it could do so only "[i]f the undue preference or discrimination is ... traceable to the level of the jurisdictional rate." 426 U.S. at 277, 96 S.Ct. at 2003–04. In this case the alleged anticompetitive pricing is traceable not to PGT's jurisdictional rate but to PG&E's nonjurisdictional rate. *Conway* provides the Commission no comfort at all.

As for *Transco*, the CPUC correctly characterizes it as a case in which the nonjurisdictional sale fell into a regulatory gap, not one in which the nonjurisdictional sale was regulated by an agency other than the Commission. As the Supreme Court explained: "[W]hen we are presented with an attempt by the federal authority to control a problem [*i.e.*, an increase in the wholesale rates of an interstate natural gas pipeline] that is not, by its very nature, one with which state regulatory commissions can be expected to deal, the conclusion is irresistible that Congress desired regulation by federal authority rather than nonregulation." 365 U.S. at 28, 81 S.Ct. at 449–50. Our opinion in *ANR Pipeline Co. v. FERC*, 876 F.2d 124, 132 (1989), puts *Transco* in proper perspective:

> [I]n *Transco*, despite the sale's impact on jurisdictional sales, no ... agency had any direct voice over whether it satisfied the public interest. We think it would be a considerable stretch from there to say that, in certifying transportation that is necessary to carry out a sale, the Commission is required to re-

consider the very aspects of the sale that have been assessed by an agency specifically vested by Congress with authority over the subject.

Although *ANR* is couched in terms of what the Commission is required to consider, a logical implication is that when the Congress explicitly reserves jurisdiction over a matter to the states, as here, the Commission has no business considering how to "induc[e] a change [of state] policy" with respect to that matter. In any event, the Commission offers no contrary authority.

Instead, the Commission insists that it has merely lowered PGT's jurisdictional rates without intruding upon the authority of the CPUC. This claim rings hollow indeed. The Commission lowered PGT's return on equity specifically and only to "induc[e] a change to a policy beyond [its] jurisdictional purview," *i.e.,* to pressure the CPUC to regulate PG&E as the Commission desired but could not itself require. Under the circumstances, the Commission was indeed attempting to do indirectly what it could not do directly, that is, intercede in a matter that the Congress reserved to the State. *See Northwest Central Pipeline v. State Corp. Comm'n,* 489 U.S. 493, 512, 109 S.Ct. 1262, 1275, 103 L.Ed.2d 509 (1989) ("The NGA was designed to supplement state power and to produce a harmonious and comprehensive regulation of the industry. Neither state nor federal regulatory body was to encroach upon the jurisdiction of the other").

### III. Conclusion

 In conceding that PG&E is a Hinshaw pipeline, the Commission expressly declined to look behind the pipeline company's corporate structure and to treat PG&E and PGT as a single company. We uphold that step as reasonable and must therefore hold that PG&E's California rates are exempt from the jurisdiction of the Commission. Although the Commission ordinarily has the authority to consider a matter beyond its jurisdiction if the matter affects jurisdictional sales—at least if there would otherwise be a regulatory gap—here there is no such gap but, on the contrary, an express congressional reservation of jurisdiction to another body.

That places the matter off-limits to the FERC.

We therefore grant PGT's petition for review insofar as it challenges the Commission's authority under § 1(c) of the NGA, 15 U.S.C. § 717(c). Accordingly, we also dismiss as moot the petition filed by the CPUC (without resolving whether the agency has standing to complain) and we deny the petition filed by Altamont and the Expansion Shippers.

*So ordered.*